Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/12/2024 09:06 AM CST

Janet Palmtag, appellant and cross-appellee, v. The
Republican Party of Nebraska, also known
as The Nebraska Republican Party,
appellee and cross-appellant.

___ N.W.2d ___

Filed January 12, 2024.    No. S-22-967.

1. **Summary Judgment: Appeal and Error.** An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

2. **Libel and Slander: Negligence.** A claim of defamation requires (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

3. **Libel and Slander: Words and Phrases.** Libel is defamation where the defamatory words are written or printed; slander is defamation where the defamatory words are spoken.

4. **Constitutional Law: Libel and Slander.** When the plaintiff is a public official or public figure and the speech is a matter of public concern, the First Amendment requires the plaintiff to surmount certain higher barriers than those raised by common-law libel.

5. ____: ____. There is no constitutional right to espouse false assertions of facts, even against a public figure in the course of public discourse.

6. **Libel and Slander: Negligence.** The principal higher barrier a public libel plaintiff must surpass is that actual malice, not simple negligence, is part of the scienter element of the plaintiff's prima facie case.

7. **Libel and Slander: Proof.** The plaintiff in a public libel action must establish actual malice by clear and convincing evidence.

8. **Summary Judgment: Libel and Slander.** The same general summary judgment standards applicable to any action apply to a public libel

action; however, the existence of a genuine issue of material fact is dependent upon the particular elements and standards of proof of the underlying action.

9. **Summary Judgment.** Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

10. **Actions: Proof.** Successful suits are not limited to those cases in which there is direct proof by a party's admission of the ultimate fact.

11. **Libel and Slander: Words and Phrases.** Actual malice means knowledge of falsity or reckless disregard for the truth.

12. **Libel and Slander: Proof.** Mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth in a defamation claim.

13. ____: ____. Standing alone, proof of a defendant's ill will toward a public figure plaintiff is insufficient to establish knowledge of falsity or reckless disregard for the truth for purposes of a defamation claim.

14. **Libel and Slander: Evidence.** Motive and negligence, including a failure to investigate, are factors in the totality of the evidence that may be considered in making reasonable inferences as to the defendant's state of mind in a public libel action.

15. **Libel and Slander: Evidence: Proof.** A plaintiff in a public libel action is entitled to prove the defendant's state of mind through circumstantial evidence.

16. **Libel and Slander.** Relevant to actual malice is the ambiguity of any source material consulted by the defendant and the reasonableness or lack thereof in interpreting that material in a way that led to the false statement forming the basis of the plaintiff's claim.

17. **Libel and Slander: Words and Phrases.** A "critical issue" is whether a source relied upon in making the false and defamatory statement was reasonably susceptible of the interpretation given it by the defendant.

18. **Libel and Slander.** An inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him or her, even though the defendant testifies that he or she believed that the statement was not defamatory and was consistent with the facts within the defendant's knowledge.

19. ____. A publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements.

20. **Corporations.** Generally, a corporation is viewed as a complete and separate entity from its shareholders and officers.

21. **Corporations: Fraud.** A court will disregard a corporation's identity only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another.

22. **Libel and Slander: Damages.** In general, the damages under common law that may be recovered for defamation are (1) general damages for harm to reputation; (2) special damages; (3) damages for mental suffering; and (4) if none of these are proved, nominal damages.

23. **Damages.** Special damages is a subset of actual harm, as actual harm is supported by evidence of injury, but the injury need not be pecuniary loss.

24. **Constitutional Law: Libel and Slander: Pleadings: Proof: Damages.** Pleading and proving special damages is not one of the higher barriers the U.S. Supreme Court has held the public libel plaintiff must surmount to protect the First Amendment right to public debate.

25. **Libel and Slander: Pleadings: Proof: Damages.** A plaintiff in a per se public libel action is not required to plead and prove special damages to state a claim.

Appeal from the District Court for Lancaster County: Andrew R. Jacobsen, Judge. Reversed and remanded for further proceedings.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellant.

Kamron T.M. Hasan and Sydney L. Hayes, of Husch Blackwell, L.L.P., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ., and Moore, Judge.

Freudenberg, J.

## I. INTRODUCTION

A general candidate for the Nebraska Legislature sued The Republican Party of Nebraska (the Party) for public libel stemming from political mailers stating that the candidate, a real estate agent, had been disciplined by the Iowa Real Estate Commission (Commission) for breaking the law and had lost her Iowa real estate license. The candidate appeals

from a summary judgment against her, in which the court found a genuine issue that the statements were false but no genuine issue that the Party acted with actual malice. The Party cross-appeals the district court's conclusion that because the candidate stated a per se defamation action, she did not have to plead and prove special damages and she had, in any event, proved special damages. We reverse the order of summary judgment on the grounds that when the facts presented by the candidate are viewed in a light most favorable to the candidate, as the nonmoving party, those facts are sufficient that a jury could find by clear and convincing evidence that the Party acted with actual malice. We find no merit to the Party's cross-appeal.

## II. BACKGROUND

Janet Palmtag has active real estate licenses in Nebraska and Missouri and an inactive license in Iowa. Her license in Iowa became inactive in January 2020. She testified that she chose to make her license inactive because she was not doing much business there.

Palmtag owns 100 percent of the common voting stock of J. J. Palmtag, Inc. (J.J.), a real estate brokerage firm organized and registered as a corporation. J.J. has three employees, including Palmtag, and has 15 independent contractor agents, including Palmtag. Palmtag receives a salary from J.J. rather than receiving income directly through her commissions.

J.J., as a corporate entity, has brokerage licenses in Nebraska and Missouri and previously had a license in Iowa. Palmtag's individual brokerage license is the managing license for J.J.

### 1. Consent Order

In August 2018, J.J. entered into a "Combined Statement of Charges, Informal Settlement Agreement, and Consent Order in a Disciplinary Case" (consent order) with the Commission. It was captioned as "IN RE: J.J. Palmtag, Inc. Firm . . . RESPONDENT" and referred to a case number (disciplinary case).

Palmtag is referred to in the consent order "both as the designated broker in charge and a licensed real estate broker officer for the Respondent real estate brokerage firm."

The consent order describes the "**STATEMENT OF CHARGES**" against J.J.:

> Respondent is charged with engaging in improper trust account procedures in violation of Iowa Code sections 543B.29(l)(k), 543B.34(1), 543B.46 (2017) by disbursing earnest money funds from an Iowa real estate trust account prior to closing and without the informed written consent of all the parties to a transaction. *See* 193E Iowa Administrative Code sections 13.1, 13.1(1), 13.1(7), 18.14(5)(f)(2).

Under "CIRCUMSTANCES," the consent order states in part:

> In a random sampling of transaction files, the auditor discovered one (1) real estate transaction for a property located in Fremont County, Iowa where the Respondent transferred trust funds from J.J. Palmtag Inc. Iowa Trust Account to Nebraska Title Trust Account without the informed written consent of all the parties to this respective transaction.

Under "**SETTLEMENT AGREEMENT**," the consent order provides that "[w]ithout admission of wrongdoing or guilt, the Respondent does not contest the violations alleged in the above-stated Statement of Charges" and that "[t]his Order constitutes discipline against the Respondent, and is the final agency order in this contested case pursuant to Iowa Code section 17A.10 and 193 Iowa Administrative Code 7.4."

Under "CIVIL PENALTY," the consent order states, "The Respondent shall pay a civil penalty to the Commission in the amount of five hundred dollars . . . ." There is no reference in the order to the loss or suspension of any real estate license.

Immediately before the signature of "Janet A. Palmtag, Broker Officer," the consent order provided, "**FOR THE**

**RESPONDENT**: Voluntarily agreed to and accepted by **J.J. Palmtag** . . . ."

Palmtag testified that she signed the consent order in her capacity as a corporate representative. Palmtag was not involved in the underlying transaction and denied being aware of it until the State of Iowa audited J.J. Palmtag testified in her deposition that the consent decree stemmed from the actions of an agent working for J.J., who was ill at the time and who is now deceased. She testified that, as owner, she takes responsibility for J.J.'s actions.

## 2. Licensing Bureau Status

The license status for J.J. and Palmtag are listed on the Iowa Professional Licensing Bureau (Bureau) online. It provides that Palmtag's license is "[i]nactive," effective January 2, 2020. It provides that the license of "J.J. Palmtag, Inc." is "[c]anceled."

The Bureau website states with respect to Palmtag that there have been "No Discipline or Board Actions."

Like her personal license, Palmtag testified she canceled J.J.'s license in Iowa because she was not doing much business there. According to Palmtag, this decision was not related to the consent order.

## 3. Political Mailers

In 2020, Palmtag was a general candidate for the Nebraska Legislature. It was undisputed that, because of this, Palmtag was a public figure. Although Palmtag was a registered Republican voter, the Party backed Palmtag's opponent in the legislative primary race. On approximately October 6, 2020, the Party mailed two mailers to approximately 3,200 households of registered voters.

The mailers were attached to Palmtag's complaint. The mailers cite the disciplinary case as the source of the information. Palmtag made an official demand for corrections on October 19, 2020. No corrections were made.

Palmtag highlighted in her complaint two statements in the mailers. The first statement was that "Janet Palmtag Broke The Law & Lost Her Real Estate License." The second statement was that "Janet Palmtag was charged with and fined for engaging in improper trust account procedures by disbursing funds . . . without the informed written consent of all the parties." These statements were also the two specific statements that Palmtag had officially demanded the Party correct.

In her response to the Party's statement of undisputed facts and a brief submitted to the trial court, Palmtag clarified she also alleged she was defamed by the statement that her real estate license had been "revoked," which was reflected in the attachments to the complaint. The mailers depicted a yard sign reading "Licensed Agent," with a red stamp over it reading "REVOKED." The mailers also described that Palmtag was "TOO IRRESPONSIBLE TO KEEP HER LICENSE."

### 4. PARTY'S INVESTIGATION

Before distributing the mailers, Ryan Hamilton, the Party's executive director, submitted them to the Party's chairman for approval, in accordance with the chairman's policy that no mailers be sent unless they are first approved by him. Hamilton testified in his deposition that he had read the consent order and J.J.'s license status on the Commission website, which stated J.J.'s license was "canceled." Hamilton did not know how many real estate agents J.J. had or which individual was involved in the underlying transaction. Hamilton did not review the webpage for Palmtag's Iowa license.

Hamilton testified he believed Palmtag was "responsible" for the violations described in the consent order. This was based on Palmtag's signature on the order and his assumption that she was the person responsible because she owned J.J. and was the designated broker in charge and licensed real estate broker officer for J.J. Although Hamilton acknowledged that J.J., the corporate entity, was the only respondent in the consent order, Hamilton said that "it seems to be a

difference without a distinction to me." Hamilton informed the chairman that he had researched the issue and reviewed the consent order and that the mailers were accurate.

The chairman testified in his deposition that he had informed Hamilton the mailers must be accurate and was assured by Hamilton that they were. He testified that he believed the statements had been sufficiently vetted. He did not entertain serious doubts about their truth.

Palmtag disputed the veracity of the chairman's and Hamilton's testimony as "self-serving." There was evidence admitted that, in a text message thread between Hamilton and a vendor involving a copy of the consent order, the vendor said, "Ok that's not real" and "[y]our call boss."

## 5. Lost Earnings

Both J.J.'s gross income and net income increased from 2019 to 2020 and from 2020 to 2021. Also, the evidence demonstrated that Palmtag's personal listings were approximately the same before and after the alleged defamation. Palmtag testified that it was "impossible to identify clients lost because listings have not been signed and persons have not approached the firm." Put differently, Palmtag testified that the identities of potential persons were not known because lost opportunities, by definition, do not present themselves.

However, Palmtag, in her deposition testimony, identified approximately $100,000 per year in lost income. She identified that her personal listings had declined. While from 2015 to 2019, her personal listings averaged 20 per year, she had 7 personal listings in 2020 and 12 in 2021.

## 6. Complaint and Answer

Palmtag alleged in her complaint that the Party made intentional, reckless, and false statements in the mailers and that each statement exhibited actual malice, knowledge of falsity, or reckless disregard for the truth.

Palmtag alleged that the statements were defamation per se because they falsely accused her of committing a crime involving moral turpitude and of unfitness to perform the duties of a public office and because, in her employment as a real estate professional, they prejudiced her in her profession and trade. Palmtag alleged that pursuant to Neb. Rev. Stat. § 25-840.01 (Reissue 2016), she was not limited to special damages because the Party declined to correct the defamatory statements after timely demand.

Palmtag alleged both general and special damages. For special damages, she alleged lost earnings, loss of equity in her business, expenses to mitigate lost earnings, and expenses for medical and psychological care. For general damages, Palmtag alleged physical illness, emotional distress, sleep disturbance, and a variety of other quality-of-life and mental health effects.

In its answer, the Party asserted Palmtag could not establish special damages and, as a result, her defamation claim was barred. In its statement of undisputed material facts, the Party quoted the definition of special damages in § 25-840.01, which states they include only damages suffered in respect to property, business, trade, profession, or occupation. In other filings before the hearing on the motion for summary judgment, the Party asserted that reputational harm and medical expenses are not special damages. It also asserted that all public libel cases, regardless of whether they are defamation per se, must plead and prove special damages as an essential element of the public libel claim.

## 7. Motion for Summary Judgment

The Party moved for summary judgment, generally alleging there was no genuine issue that the statements were substantially true, it did not act with actual malice, and there were no special damages. In its statements of undisputed material fact and at the hearing, the Party elaborated as to special damages that Palmtag could not prove lost business

proximately caused by the mailers. It relied on a statement in *Moats v. Republican Party of Neb.*[1] that "[t]he plaintiff in a 'public-libel' action must establish that the alleged statement is false by clear and convincing evidence and establish special damages."

In her brief in opposition to summary judgment, Palmtag stated, "Though whether the Consent Order constitutes 'discipline' is a complex question under Iowa's statutes and regulations, it is clear the Consent Order did not suspend or revoke . . . Palmtag's license." In fact, "no real estate license was ever suspended, revoked, or lost as a result of any proceeding involving . . . Palmtag or J.J."

Palmtag also noted that the Commission website "discloses no license revocations nor violations of the law by . . . Palmtag."

According to Palmtag, the false statements at issue were not supported by any reasonable reading of the material Hamilton said he consulted. Furthermore, discovery of the falsity of the statements in the mailers could have been easily made through a phone call or by looking at the Bureau website. Neither Hamilton nor the chairman made any real investigation because they were told by a "'big donor'" to "'[g]o hard on [Palmtag].'"

Palmtag cited to our statement in *McKinney v. Okoye*[2] that "[s]tate of mind is difficult to prove, and rarely will the plaintiff be able to provide a '"smoking gun."' Thus, . . . cases where the underlying issue is one of motive or intent are particularly inappropriate for summary judgment." She argued that the evidence was sufficient in combination for a rational finder of fact to conclude by clear and convincing evidence that the Party acted with actual malice and that its statements to the contrary were not credible.

---

[1] *Moats v. Republican Party of Neb.*, 281 Neb. 411, 422, 796 N.W.2d 584, 594 (2011).

[2] *McKinney v. Okoye*, 287 Neb. 261, 275, 842 N.W.2d 581, 594 (2014).

Palmtag denied that she had to prove special damages. Nonetheless, she asserted that she had presented evidence supporting a genuine issue of whether special damages could be shown.

## 8. Order Granting Summary Judgment

The district court granted the Party's motion for summary judgment. The court stated that Palmtag alleged only that the two statements set forth in her demand to correct and in her complaint were defamatory, but the parties disputed to what extent the court should consider other statements in the mailers. The court said that it must consider the full content of the mailers for context.

### (a) Falsity

The court found that although it was substantially true that J.J. broke the law and was fined for improper trust account procedures, the substance of the statement was that Palmtag, as an individual, had broken the law and was fined. The court relied on cases considering whether corporate representatives had personal knowledge or involvement in the matters that were the subject of the defamatory statements. The court concluded there was a genuine issue of whether the statements that Palmtag broke the law and was charged and fined for improper trust account procedures were substantially true. It noted evidence that Palmtag was "not involved at all in the underlying transaction and was not even aware of it until the State of Iowa audited the [c]orporation."

The court also found a genuine issue as to whether it was substantially true that Palmtag had "'lost'" her license. It noted that J.J. and Palmtag had separate licenses. The court observed that the Commission never told Palmtag to stop selling real estate in Iowa or to stop holding herself out as licensed to sell real estate and that Palmtag had voluntarily changed her license status to inactive because she was not doing business there and did not want to pay the renewal fees.

### (b) Special Damages

The district court rejected the Party's argument that in all public libel cases the plaintiff must prove special damages. The district court explained that our reasoning in *Moats* was inconsistent with our broad statement therein that a plaintiff in a public libel action must establish special damages regardless of whether the underlying statement constituted libel per se. The district court observed that we discussed in *Moats* that in a per se libel action, special damages are not required and concluded that because the statements were not defamation per se, the plaintiff had to plead special damages. The district court found no other support for the proposition that a per se public libel action requires special damages. The court found Palmtag had stated a claim for libel per se because the statements implied she was unfit to work as a real estate broker. In the alternative, the court found a genuine issue of whether Palmtag suffered special damages.

### (c) Actual Malice

The district court explained that the usual rules for summary judgment apply to actual malice. It said that the clear and convincing evidence standard applies at the summary judgment stage inasmuch as the inquiry is whether a trier of fact could find actual malice by clear and convincing evidence, but questions of motive and intent are particularly inappropriate for summary judgment.

However, citing to *Bose Corp. v. Consumers Union of U. S., Inc.*,[3] the district court also said that whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a threshold question of law that the Constitution requires judges to make before entry of a judgment against the defendant.

---

[3] *Bose Corp. v. Consumers Union of U. S., Inc.*, 466 U.S. 485, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984). See, also, *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989).

The district court observed that Palmtag had produced no evidence directly contradicting Hamilton's testimony that he subjectively believed Palmtag herself had broken the law and that the Commission had charged and fined her for improper trust account procedures. The court also found no evidence of purposeful avoidance of the truth. The court noted statements by the U.S. Supreme Court that the failure to further investigate is insufficient to demonstrate malice. Also, the district court questioned how the Party reasonably could have conducted a further investigation. Citing to the "Iowa Code §§ 272C.1(6)(d) [and] 272C.6(4)(a)," as well as to the "Iowa Admin. Code r. 193E-18.8," the district court said the Commission's investigative information is generally privileged. It did not directly address if the Bureau website information about Palmtag having "No Discipline or Board Actions" was available to the Party. It also did not address whether the Party could have discovered Palmtag's license was listed as "[i]nactive," effective January 2, 2020.

The district court implicitly concluded that the Party operated under a reasonable misunderstanding of ambiguous sources: (1) the consent order and (2) the Bureau website's licensing status for J.J. The district court found, in relation to the Bureau's website showing the license status for J.J., that the Party could have rationally interpreted the phrase "[c]anceled" as consistent with "'lost.'" The court did not directly address whether the Party could have rationally read the Bureau information for J.J.'s license status as indicating that Palmtag's, as opposed to J.J.'s, license had been "[c]anceled." The district court suggested the consent order was likewise ambiguous. However, the court did not elaborate on what aspects of the consent order were ambiguous and what rational interpretations of it the Party had made.

Despite acknowledging that Palmtag was arguing the consent order on its face showed J.J., and not Palmtag, was the disciplined party and having found a genuine issue of whether

the statements were false because they implicated Palmtag individually rather than only J.J., the court did not explicitly address if the Party's sources were ambiguous as to whether Palmtag, as an individual, broke the law, was disciplined, and lost her license. Nor did the district court explicitly address the reasonableness of the Party's stated subjective belief that Palmtag, as an individual, broke the law, was disciplined, and lost her real estate license.

## III. ASSIGNMENTS OF ERROR

Palmtag assigns, summarized, that the district court erred in sustaining the motion for summary judgment by finding insufficient evidence of actual malice as a matter of law and failing to give Palmtag the benefit of all reasonable inferences.

The Party cross-appeals, assigning that the district court erred by determining that Palmtag (1) was not required to present a genuine issue of material fact that she incurred special damages and (2) had presented a genuine issue of material fact that she incurred special damages.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[4]

## V. ANALYSIS

### 1. Overview of Elements

[2,3] In the ordinary case, a claim of defamation requires (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm

---

[4] *Brown v. State, ante* p. 336, 996 N.W.2d 56 (2023).

or the existence of special harm caused by the publication.[5] Libel is defamation where the defamatory words are written or printed; slander is defamation where the defamatory words are spoken.[6]

[4] When the plaintiff is a public official or public figure[7] and the speech is a matter of public concern, the First Amendment requires the plaintiff to surmount certain higher barriers than those raised by common-law libel.[8] This is because erroneous statements are inevitable in free debate and must be protected.[9] Furthermore, a rule compelling a critic of official conduct to guarantee the truth of all factual assertions, on pain of libel judgments, would lead to self-censorship.[10] Finally, it has been observed that public officials and public figures, due to greater access to channels of effective communication, have a greater opportunity than private individuals to counteract false statements and minimize its adverse impact on reputation,[11] and they have normally assumed roles for which they must accept certain necessary consequences.[12]

[5] Nevertheless, the First Amendment's protections of public debate are not absolute.[13] It is well settled that there is no constitutional right to espouse false assertions of facts, even against a public figure in the course of public discourse.[14]

---

[5] *Moats v. Republican Party of Neb., supra* note 1.

[6] 50 Am. Jur. 2d *Libel and Slander* § 6 (2017).

[7] See *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967).

[8] See *Hoch v. Prokop*, 244 Neb. 443, 507 N.W.2d 626 (1993).

[9] See *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

[10] See *id.*

[11] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

[12] *Id*.

[13] See *Moats v. Republican Party of Neb., supra* note 1.

[14] *Id.*

[6] The principal higher barrier a public libel plaintiff must surpass is that actual malice, not simple negligence, is part of the scienter element of the plaintiff's prima facie case.[15]

Another barrier particular to a public libel action is that, to be constitutionally sufficient "to support a finding that the statements referred to" the plaintiff, there must be evidence, other than general assumptions attaching praise or criticism to the official in control of the body, connecting the plaintiff to the statements at issue.[16] The statements must be "specifically made of and concerning"[17] the plaintiff to be actionable.

[7] Finally, there is a heightened "clear and convincing" burden of proof for certain elements of a public libel action, instead of the preponderance of the evidence standard that would normally apply because it is a civil action. Most notably, the plaintiff in a public libel action must establish actual malice by clear and convincing evidence.[18] But we have also held that the plaintiff in a public libel action bears the burden of proving by clear and convincing evidence the element of falsity of the published statements.[19] Further, we have indicated that it is the plaintiff's burden to establish by clear and convincing evidence that the statements are "of and concerning the plaintiff."[20]

## 2. SUMMARY JUDGMENT STANDARD
### FOR PUBLIC LIBEL ACTIONS

[8] Palmtag suggests that the district court utilized an inappropriately high summary judgment standard in determining

---

[15] See *Hoch v. Prokop, supra* note 8.

[16] *New York Times Co. v. Sullivan, supra* note 9, 376 U.S. at 292.

[17] *Rosenblatt v. Baer*, 383 U.S. 75, 80, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966). See, also, *Deaver v. Hinel*, 223 Neb. 529, 391 N.W.2d 128 (1986).

[18] *Hoch v. Prokop, supra* note 8. See *Gertz v. Robert Welch, Inc., supra* note 11.

[19] See *Deaver v. Hinel, supra* note 17. See, also, *Firestone v. Time, Inc.*, 460 F.2d 712 (5th Cir. 1972).

[20] *Deaver v. Hinel, supra* note 17, 223 Neb. at 539, 391 N.W.2d at 135.

whether there was a genuine issue pertaining to the elements of Palmtag's public libel action. We agree that the same general summary judgment standards applicable to any action apply to a public libel action; however, the existence of a genuine issue of material fact is dependent upon the particular elements and standards of proof of the underlying action.

[9] In general, summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[21] The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial.[22] If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.[23] If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[24]

In its order granting the Party's motion for summary judgment, the court stated the usual rules of summary judgment applied. However, it also cited to the independent appellate

---

[21] *407 N 117 Street v. Harper*, 314 Neb. 843, 993 N.W.2d 462 (2023).

[22] *Clark v. Scheels All Sports*, 314 Neb. 49, 989 N.W.2d 39 (2023).

[23] *Id*.

[24] *Id*.

review doctrine established by *Bose Corp.*[25] We clarify that this is not a standard applicable to summary judgment.

In *Bose Corp.*, the U.S. Supreme Court held that the question of whether the evidence in the record is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact.[26] Judges, as expositors of the Constitution, must independently decide whether the evidence is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice.[27] The Court elaborated that in determining whether the constitutional standard of liability has been satisfied in cases of defamation of a public figure, there is a requirement of independent appellate review to decide whether the evidence in the record is sufficient to "cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'"[28] The Court said that although credibility determinations are reviewed under the clearly erroneous standard, because the trier of fact has had the "opportunity to observe the demeanor of the witnesses,"[29] the reviewing court must "examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect."[30]

There is a difference between independently reviewing on appeal the entirety of the evidence at trial to determine if the statements are of a character that the principles of the First Amendment protect and conducting such an examination

---

[25] *Bose Corp. v. Consumers Union of U. S., Inc., supra* note 3.

[26] *Id.*

[27] *Id.*

[28] *Id.*, 466 U.S. at 511.

[29] *Id.*, 466 U.S. at 499-500.

[30] *Id.*, 466 U.S. at 508 (internal quotation marks omitted).

upon the more limited evidence presented at a summary judgment hearing and without the benefit of a trier of fact's credibility determinations. At the summary judgment stage, the primary issue remains whether there is a genuine issue of material fact.

Indeed, the U.S. Supreme Court specifically addressed the proper summary judgment standard for a public defamation case in *Anderson v. Liberty Lobby, Inc.*[31] The Court said that whether there is a genuine issue of material fact for purposes of summary judgment necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.[32] Thus, whether any dispute about actual malice is genuine involves a determination of whether there is enough probative evidence from which reasonably minded jurors could find that actual malice has been proved by clear and convincing evidence.[33] "[T]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence."[34]

The Court acknowledged it may be unlikely that the higher standard of proof at trial would produce different results at the summary judgment stage,[35] but said it did not follow that it could never make a difference. The Court elaborated that merely asserting the jury might disbelieve the defendant's testimony as to an innocent state of mind is insufficient, in itself, to overcome a motion for summary judgment in a public libel action.[36] The Court held that the movant must set forth

---

[31] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[32] *Id.*

[33] See *id.*

[34] *Id.*, 477 U.S. at 254.

[35] *Id.*

[36] *Anderson v. Liberty Lobby, Inc., supra* note 31.

specific facts showing a genuine issue and may not rest only upon mere allegations or denials.[37]

Still, the Court in *Anderson* reiterated that a higher underlying burden of proof at trial does not change the fact that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."[38] Furthermore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[39]

[10] The Court emphasized in *Anderson* that its "holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury."[40] The Court reiterated that, as always, trial courts should act with caution in granting summary judgment. The Court emphasized that where a result turns upon a choice of permissible inferences from undisputed evidence, summary judgment may not properly be granted.[41] Finally, the Court in *Anderson* explained that successful suits are not limited to those cases in which there is direct proof by a party's admission of the ultimate fact.[42] This is consistent with the Court's statement in *St. Amant v. Thompson*[43] that "[t]he defendant in a defamation action brought by a public [figure] cannot . . . automatically insure a favorable [judgment] by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith."

---

[37] *Id.*

[38] *Anderson v. Liberty Lobby, Inc., supra* note 31, 477 U.S. at 255.

[39] *Id.*

[40] *Id.*

[41] See *Nader v. de Toledano*, 408 A.2d 31 (D.C. App. 1979).

[42] See *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969).

[43] *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968).

To the extent the district court incorrectly relied on *Bose* in deciding if there was a genuine issue of material fact, it is of no consequence, because we review the district court's grant of summary judgment de novo. We will apply the standards set forth in *Anderson* to the parties' dispute as to whether there were genuine issues that (1) the Party acted with actual malice and (2) Palmtag suffered actionable harm. We note that the Party does not assign as error the district court's finding that there was a genuine issue that the statements were false and defamatory, because there was evidence that Palmtag lacked personal knowledge or involvement in the underlying actions leading to the consent judgment. And there appears to be no dispute that the statements at issue were made "of and concerning" Palmtag.[44]

### 3. Actual Malice

[11] We first address whether there was a genuine issue of actual malice. Actual malice means knowledge of falsity or reckless disregard for the truth.[45] This is analogous to the scienter necessary to negate the privilege for statements by public officials.[46]

The U.S. Supreme Court has acknowledged the concept of "'[r]eckless disregard'" "cannot be fully encompassed in one infallible definition."[47] It has said the defendant must have made the false publication with a "high degree of awareness of . . . probable falsity,"[48] "entertained serious doubts as to the

---

[44] See *Rosenblatt v. Baer, supra* note 17, 383 U.S. at 80. See, also, *Deaver v. Hinel, supra* note 17.

[45] *Hoch v. Prokop, supra* note 8.

[46] See, *Gertz v. Robert Welch, Inc., supra* note 11; *New York Times Co. v. Sullivan, supra* note 9.

[47] *St. Amant v. Thompson, supra* note 43, 390 U.S. at 730.

[48] *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964).

truth of his publication,"[49] had a necessary awareness of probable falsehood,[50] or "obvious reasons to doubt the veracity of the informant or the accuracy of his reports."[51]

Palmtag relies on several aspects of the evidence admitted at the summary judgment hearing as being sufficient for a reasonably minded jury to find actual malice by clear and convincing evidence. She argues the statements in the mailers were directly contrary to the plain language of the consent order and the Bureau's website for J.J.'s licensing status and not a reasonable reading of ambiguous sources. She also points to the lack of proper investigation, political motives behind the mailers, and the text thread as evidence supporting a genuine issue of actual malice.

The Party, for its part, argues that the consent order and license status were ambiguous and that its statements constituted reasonable interpretations of the source materials. It then asserts that this reasonable misunderstanding of ambiguous documents is insufficient as a matter of law to support a finding of actual malice—even if combined with its ill will toward Palmtag and a failure to further investigate. It argues that any reliance on the text thread stating "that's not real" is being raised for the first time on appeal and does not show actual malice because it is unclear what the texts refer to and would not give the Party reason to doubt its understanding of the Bureau website and the consent order.

[12,13] In making these arguments, the Party relies on precedent by the U.S. Supreme Court holding that mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth.[52] Likewise, standing alone, proof of a defendant's ill will toward a public figure plaintiff is insufficient to establish knowledge of falsity or reckless

---

[49] *St. Amant v. Thompson, supra* note 43, 390 U.S. at 731.

[50] *Herbert v. Lando*, 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979).

[51] *St. Amant v. Thompson, supra* note 43, 390 U.S. at 732.

[52] *Gertz v. Robert Welch, Inc., supra* note 11.

disregard for the truth for purposes of a defamation claim.[53] But it does not follow that ill will and investigatory deficiencies are irrelevant and cannot be considered by a trier of fact together or in conjunction with other evidence.[54]

[14,15] To the contrary, the U.S. Supreme Court has made clear that motive and negligence, including a failure to investigate, are factors in the totality of the evidence that may be considered in making reasonable inferences as to the defendant's state of mind in a public libel action.[55] The U.S. Supreme Court in *Harte-Hanks Communications v. Connaughton*[56] held that a plaintiff in a public libel action "is entitled to prove the defendant's state of mind through circumstantial evidence."[57] Further, "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."[58]

[16,17] As the Party points out, also relevant to actual malice is the ambiguity of any source material consulted by the defendant and the reasonableness or lack thereof in interpreting that material in a way that led to the false statement forming the basis of the plaintiff's claim. A "critical issue" is whether a source relied upon in making the false and defamatory statement was "reasonably susceptible of the interpretation" given it by the defendant.[59]

---

[53] *Jackson v. Hartig*, 274 Va. 219, 645 S.E.2d 303 (2007).

[54] See, e.g., *Harte-Hanks Communications v. Connaughton, supra* note 3; *Goldwater v. Ginzburg, supra* note 42.

[55] See *id.*

[56] *Harte-Hanks Communications v. Connaughton, supra* note 3, 491 U.S. at 668.

[57] See, *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 88 S. Ct. 197, 19 L. Ed. 2d 248 (1967); *Henry v. Collins*, 380 U.S. 356, 85 S. Ct. 992, 13 L. Ed. 2d 892 (1965).

[58] *Harte-Hanks Communications v. Connaughton, supra* note 3, 491 U.S. at 668.

[59] *Nader v. de Toledano, supra* note 41, 408 A.2d at 53.

Thus, in *Time, Inc. v. Pape*,[60] the Court held that the adoption of one of several possible rational interpretations of an "extravagantly ambiguous" document was not enough to create a jury issue of actual malice. In an article, a news magazine attempted to summarize a lengthy government document, a report of the U.S. Commission on Civil Rights, describing "'chilling text about police brutality'" and that "the report cites Chicago police treatment of Negro James Monroe and his family."[61] The article went on to quote the summary of the filed civil rights complaint found in the Commission's report. At issue in the public libel action was the fact that the news article failed to specify these were charges by the complainant rather than independent findings by the Commission.

The U.S. Supreme Court explained that the commission's report was ambiguous as to whether it had independently determined the truth of the incident alleged in the civil rights complaints it set forth. This was because the facts of the civil rights complaints were contained within a report that repeatedly asserted it was "dealing with a problem of unquestionable reality and seriousness."[62] Furthermore, the civil rights complaints were described under a heading entitled "'UNLAWFUL POLICE VIOLENCE,'" and the Commission said it was of the opinion that "'the allegations appeared substantial enough to justify discussion in this study.'"[63]

Given the ambiguities of the source and the testimony by the author of the article that they believed that the commission believed the incident had occurred as described, the Court in *Pape* reversed the lower appellate court's reversal of a directed verdict in favor of the publisher. There was no other evidence presented supporting an inference of actual

---

[60] *Time, Inc. v. Pape*, 401 U.S. 279, 287, 91 S. Ct. 633, 28 L. Ed. 2d 45 (1971).

[61] *Id.*, 401 U.S. at 281, 282.

[62] *Id.*, 401 U.S. at 286.

[63] *Id.*, 401 U.S. at 287.

malice. The U.S. Supreme Court held there was insufficient evidence to permit the conclusion that the publisher acted with the requisite reckless disregard for truth or falsity that constitutes actual malice.

Likewise, in *Bose Corp.*, the U.S. Supreme Court held that a choice of one of several possible rational interpretations of an ambiguous event does not place the speech beyond First Amendment protections.[64] Therein, the defendant published an article in its magazine evaluating loudspeaker systems. The article described the sound of the plaintiff's system as tending to "'wander about the room.'"[65] This was found to be false because the sound actually tended to wander back and forth "'along the wall'"[66] between the two speakers of the system.

In *Bose Corp.*, the original report and the article were written by the same engineer. The original report described the movement of sound around the room rather than along the wall. Only upon cross-examination at trial did it become apparent that the sound moved back and forth along the wall between the speakers. The engineer could not explain the choice of words he used in his report and in the article, but testified he believed they described what was observed.

The U.S. Supreme Court in *Bose Corp.* reversed a verdict in favor of the plaintiff for product disparagement, holding that there was insufficient evidence to support a finding of actual malice. The Court observed that "the only evidence of actual malice on which the District Court relied was the fact that the statement was an inaccurate description of what [the engineer] actually perceived."[67] There was no evidence presented that the engineer had a motive to disparage the

---

[64] *Bose Corp. v. Consumers Union of U. S., Inc., supra* note 3.

[65] *Id*., 466 U.S. at 488.

[66] *Id*., 466 U.S. at 490.

[67] *Id*., 466 U.S. at 512.

plaintiff or had failed to investigate. The Court held that the language chosen by the engineer was one of a number of possible rational interpretations of an event that "'bristled with ambiguities'" and "descriptive challenges for the writer."[68] The Court indicated that an individual who uses a malapropism and "did not realize his folly at the time" is not liable simply because an intelligent speaker would know the term was inaccurate in context.[69]

In contrast to such reasonable interpretations of ambiguous sources or events or the wrong choice of words when faced with "descriptive challenges," "a publisher . . . who deliberately distorts [the] statements [of others] to launch a personal attack of his own on a public figure, cannot rely on a [First Amendment] privilege . . . . In such instances he assumes responsibility for the underlying accusations."[70]

[18] "[A]n inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even [though] the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."[71] This is "not simply a failure to investigate, but a failure to consider contradictory evidence already in his possession."[72]

[19] "[A] publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements."[73]

---

[68] *Id.*

[69] *Id.*, 466 U.S. at 513.

[70] *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977).

[71] *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983).

[72] *Robertson v. McCloskey*, 666 F. Supp. 241, 250 (D.D.C. 1987).

[73] *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 538 (7th Cir. 1982). See, also, *Hunt v. Liberty Lobby, supra* note 71; *Fitzgerald v. Penthouse Intern., Ltd.*, 691 F.2d 666 (4th Cir. 1982).

Also, the deliberate omission of important information that would have substantially modified, qualified, or eliminated the defamatory meaning can support a finding of actual malice.[74]

Accordingly, in *Harte-Hanks Communications*, the U.S. Supreme Court held there was sufficient evidence of actual malice relating to what the jury found were false and defamatory statements by a newspaper reporting that a challenger candidate in an election had offered jobs and a trip to two sisters in exchange for helping an investigation that led to the arrest of the incumbent.[75] There was evidence of motive by the newspaper to purposefully avoid the truth that the sister who reached out to them with the allegations of bribery was lying. And although the newspaper interviewed all other witnesses to the conversation in which the challenger allegedly bribed the sisters, the newspaper chose not to interview the other sister or listen to a recording of the conversation in their possession in which the alleged bribery of the sisters took place.

The U.S. Supreme Court in *Harte-Hanks Communications* found this evidence sufficient to support the jury's implicit rejection of the credibility of the newspaper's innocent explanations as to why it did not verify the allegations by interviewing the sister or by listening to the tape. It followed from the jury's assessment of credibility that the newspaper's inaction "was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the charges, amounting to "the purposeful avoidance of the truth."[76] This, explained the Court, demonstrated a reckless disregard for the truth amounting to actual malice.

---

[74] See David A. Elder, Defamation: A Lawyer's Guide § 7:13 (Oct. 2023 update).

[75] *Harte-Hanks Communications v. Connaughton, supra* note 3.

[76] *Id*. 491 U.S. at 692.

A similar conclusion was reached by the Sixth Circuit Court of Appeals in *Young v. Gannett Satellite Information Network*[77] in affirming a jury verdict for the plaintiff in a public libel action. A newspaper editor wrote that a police sergeant had been terminated for forcing sex on a coworker and stated that the sergeant "'had sex with a woman while on the job.'"[78] The sergeant had in fact initially been fired for sexual assault, but the termination was overturned by an arbitrator who stated, in a report consulted by the editor, that the allegations had not been proved.

In *Young*, the arbitrator noted in the report that the DNA sample from the scene did not match the DNA of the sergeant and that the accuser had a history of behavior that undermined her credibility. On the other hand, the arbitrator also found that the sergeant was not credible in his claim that he had never engaged in sexual conduct with the woman. The arbitrator conceded the truth was probably "'somewhere in the middle.'"[79] The arbitrator ultimately ordered a suspension for inappropriate sexual remarks at work about the woman.

On appeal, the court in *Young* held there was sufficient evidence for the jury to have decided that the source arbitrator's report was not an ambiguous document or that the editor's interpretation of the report was not rational. The court also noted that the editor failed to conduct any investigation beyond the records of the original case. The jury could have concluded the editor had a reckless disregard of the truth with the motive to fit the editor's desired storyline. Thus, there was sufficient evidence to support the jury's finding of actual malice by clear and convincing evidence.

---

[77] *Young v. Gannett Satellite Information Network*, 734 F.3d 544 (6th Cir. 2013).

[78] *Id*. at 545.

[79] *Id*. at 548.

Similarly, in *Nader v. de Toledano*,[80] the D.C. Court of Appeals found summary judgment was not appropriate where, despite the source material being lengthy, it was not reasonably susceptible to the interpretation given it by the journalist defendant. The journalist had stated in a newspaper column that a U.S. Senate subcommittee report showed that the plaintiff, a public interest advocate, had falsified and distorted evidence to make his case that an automobile model was unsafe. The lengthy subcommittee report largely consisted of a point-by-point refutation of the advocate's charges of unsafety. Nevertheless, the report concluded unambiguously: "'[W]e believe [the charges] were made in good faith based on the information available to him.'"[81]

The court in *Nader* stated that the subcommittee's report was not reasonably susceptible to the interpretation of it advanced by the journalist. Thus, the journalist was not immune from liability on that ground. Instead, the unambiguous "good faith" conclusion set forth in the report afforded a sufficient evidentiary basis from which a reasonable inference of actual malice could be drawn. And "[w]here a result turns upon a choice of permissible inferences from undisputed evidence, summary judgment may not properly be granted."[82]

We determine, for purposes of our summary judgment review, that the sources relied upon by the Party were not ambiguous as to whether they pertained to J.J., the corporate entity, as opposed to Palmtag, in her personal capacity. And, as the district court observed, the substance of the Party's statements in the mailers was that Palmtag, as an individual, had broken the law, was fined, and had lost her license as a result—not that J.J., the corporation, had done so. Attributing these acts and consequences to Palmtag personally rather

---

[80] *Nader v. de Toledano, supra* note 41.

[81] *Id.* at 37.

[82] *Id.* at 54.

than to J.J., the corporation, was not a case of descriptive challenges or a malapropism and was not a reasonable interpretation of ambiguous source materials.

The Party does not even attempt to explain how the Bureau's website information was ambiguous as to whether J.J.'s or Palmtag's license had been "[c]anceled." The website's information plainly referred to the license status of "J.J. Palmtag, Inc." being canceled. It nowhere referred to "Janet Palmtag."

As for the consent order, the Party claims it was ambiguous as to whether the violation described therein was committed by Palmtag individually, because she signed it. However, the consent order plainly refers to "J.J. Palmtag Inc. Firm" as the only respondent. The order goes on to state that "*the Respondent* does not contest the violations alleged," "[t]his Order constitutes discipline against *the Responden*t," and "[*t*]*he Respondent* shall pay a civil penalty to the Commission in the amount of five hundred dollars." (Emphasis supplied.)

Nowhere does the consent order describe that Palmtag personally committed these violations or was fined in her personal capacity. That the consent order referred to Palmtag as the designated broker in charge and a licensed real estate broker officer "for the Respondent real estate brokerage firm" does not imply that Palmtag was subject to the order in her personal capacity. Furthermore, it is not a reasonable interpretation of the consent order that Palmtag personally committed the violation or was legally liable in her personal capacity for the violation because her signature line describes she was signing as "Janet A. Palmtag, Broker Officer." That signature line was preceded by the clear language that she was signing "**FOR THE RESPONDENT**: Voluntarily agreed to and accepted by **J.J. Palmtag** . . . ."

[20] The Party was aware that J.J. is a corporate entity, which, in any event, was plainly reflected in the source materials. Generally, a corporation is viewed as a complete and

separate entity from its shareholders and officers.[83] Organizing a corporation to avoid personal liability is a legitimate goal and is one of the primary advantages of doing business in the corporate form.[84]

[21] A court will disregard a corporation's identity only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another.[85] But there was no evidence that the Party had reason to believe Palmtag personally used J.J.'s identity to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another.

Instead, Hamilton testified he subjectively believed Palmtag was "responsible" for the violations because she owned J.J., was the designated broker in charge for J.J., and a licensed real estate broker officer for J.J. He considered the fact that the consent order was plainly against J.J. "a difference without a distinction to me." Hamilton's alleged misunderstanding of the law does not mean that the source materials were ambiguous as to whether Palmtag in her personal capacity had committed any violation for which she was fined or that Palmtag's personal brokerage license had been "[c]anceled."

We also find that it was not a reasonable interpretation of the source materials that the cancellation of J.J.'s license, reflected on the Bureau's website, was because of the violation described in the consent decree. The substance of the statement in the political mailer that "Palmtag Broke The Law & Lost Her Real Estate License" was that she lost her license because of breaking the law. However, the consent decree specifically and plainly stated that the consequence of the violation set forth therein was a fine, and it nowhere indicated that

---

[83] *Christian v. Smith*, 276 Neb. 867, 759 N.W.2d 447 (2008).

[84] *Axtmann v. Chillemi*, 740 N.W.2d 838 (N.D. 2007).

[85] *Christian v. Smith, supra* note 83.

a license revocation would result from the violation or that any person's or entity's brokerage license would in any way be affected by the violation. Similarly, the Bureau information for J.J.'s license status nowhere referenced the consent decree or any law violation. The implication of "lost" was not that Palmtag had somehow misplaced her real estate license but that it was forfeited by breaking the law. Even if "canceled" could be considered ambiguous to the extent that "lost" is a reasonable interpretation of that term, there is nothing in the source materials tying the cancellation to the violation described in the consent decree.

Because the consent decree and the license status are not ambiguous as to whether Palmtag, as opposed to J.J., committed the violation described in the consent decree or as to whether Palmtag or J.J. lost a brokerage license because of the violation, the Party cannot rely on case law holding that publishing a rational interpretation of an ambiguous report is insufficient to demonstrate actual malice. The lack of ambiguity in the Party's only two sources raises the question of whether, by accusing Palmtag personally of breaking the law and losing her license as a result, the Party deliberately distorted unambiguous sources to launch a personal attack, which would support actual malice. It is the function of a jury to determine Hamilton's credibility concerning his disregard of J.J.'s separate corporate identity and his rationale for assuming the cancellation of J.J.'s license was because of the violation.

Moreover, the Party's statements that were not reasonable interpretations of the source materials were not the only evidence presented at the summary judgment hearing that could support actual malice. Most apparent, there was a failure to investigate beyond the two sources that plainly implicated only J.J. and plainly did not tie the violation described in the consent decree to Palmtag or to the cancellation of J.J.'s license. Leaving aside whether some information pertaining to the allegations may have been confidential, the Party

presents no argument as to why it could not have investigated Palmtag's license status on the Bureau's website just as it did J.J.'s. The Party also could have requested more information from Palmtag. Thus, a jury could find the Party chose not to investigate further in a purposeful avoidance of the truth.

Palmtag also presented evidence of possible ill will in the form of political motivation to discredit her to the voting public. Furthermore, there was a text thread telling Hamilton, "Ok that's not real." We disagree with the Party's argument that the text thread cannot be considered on appeal in combination with other evidence in determining whether there was a genuine issue that the Party acted with actual malice. The Party argues that the meaning of the texts is not clear and that Palmtag is specifically articulating an argument based on the texts for the first time on appeal. Any lack of clarity is a matter for the trier of fact and could have been the subject of an objection to the text thread. But the record reflects that the exhibit was admitted into evidence without objection. While an appellate court will not consider an argument or theory raised for the first time on appeal,[86] the argument made by Palmtag below was that the evidence presented at the summary judgment hearing demonstrated a genuine issue of material fact. The effect of the text thread was before the trial court even though it may not have been pointed out with particularity. Viewing the texts in a light most favorable to Palmtag as the nonmoving party, a jury could determine it evidenced the Party's awareness that its statements were not true.

Palmtag did not simply rest on allegations and denials but provided several specific facts from which a jury could find by clear and convincing evidence of actual malice in falsely stating that Palmtag had broken the law, been fined, and lost her license because of the law violation. A reasonable fact finder could find the Party's attestations of innocence disingenuous. It could instead find that the false and defamatory

---

[86] *Elbert v. Young*, 312 Neb. 58, 977 N.W.2d 892 (2022).

statements were made with a "high degree of awareness of . . . probable falsity,"[87] that the Party "entertained serious doubts as to the truth" of the statements,[88] or that the Party had a necessary awareness of the probable falsehood[89] of the statements. Or a reasonable fact finder might reject all of those interpretations. There was sufficient evidence to present a genuine issue of whether the Party acted with actual malice. The court erred in granting summary judgment on the grounds that no reasonable juror could find by clear and convincing evidence that the Party acted with actual malice.

### 4. DAMAGES

We turn to the question of whether there was a genuine issue that Palmtag suffered actionable harm because of the libelous statements. In its cross-appeal, the Party argues the district court erred by determining that Palmtag was not required to present a genuine issue that she incurred special damages to state a claim, which the Party argues is contrary to our decision in *Moats*. The Party does not assign as error the court's conclusion that Palmtag's action involves defamation per se. The Party also asserts the district court erred in its alternative finding of a genuine issue of whether special damages had been incurred as a proximate result of the allegedly defamatory statements.

We agree with the district court that because Palmtag's action involves defamation per se, she was not required to prove special damages. We therefore do not address the district court's alternative determination that there was sufficient evidence for a jury to find that Palmtag incurred special damages.

[22] In general, the damages under common law that may be recovered for defamation are (1) general damages for

---

[87] See *Garrison v. Louisiana, supra* note 48, 379 U.S. at 74.

[88] See *St. Amant v. Thompson, supra* note 43, 390 U.S. at 731.

[89] See *Herbert v. Lando, supra* note 50.

harm to reputation; (2) special damages; (3) damages for mental suffering; and (4) if none of these are proved, nominal damages.[90]

However, we have said that words that are actionable "per quod" do not constitute a basis for recovery of damages in the absence of a specific allegation of special damages.[91] This is in contrast to words that are actionable "per se," for which we have held that no proof of any actual harm to reputation or any other damage is necessary for recovery of either nominal or substantial damages.[92]

By statute, § 25-840.01(1) provides that the plaintiff's recovery in a libel action is limited to special damages unless the plaintiff requested a correction and the defendant failed to publish one within the time and in the manner specified by the statute. Section 25-840.01(2) provides, "This section shall not apply if it is alleged and proved that the publication was prompted by actual malice, and actual malice shall not be inferred or presumed from the publication." Because Palmtag requested a correction, the limitation of § 25-840.01(1) is not applicable to her action.

We have said defamation is per se if the words are actionable in themselves because they (1) falsely impute the commission of a crime involving moral turpitude, (2) an infectious disease, or (3) unfitness to perform the duties of an office or employment, or if they prejudice one in his or her profession or trade or tend to disinherit one.[93] We have also said that "any language the nature and obvious meaning of which is to

---

[90] See *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990).

[91] See *Hruby v. Kalina*, 228 Neb. 713, 424 N.W.2d 130 (1988).

[92] See, *McCune v. Neitzel, supra* note 90; *Williams v. Fuller*, 68 Neb. 354, 94 N.W. 118 (1903).

[93] See, e.g., *Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991). See, also, Rodney A. Smolla, Rights and Liabilities in Media Content: Internet, Broadcast, and Print § 6:34 (2d ed. Nov. 2023 update); 4 Barry A. Lindahl, Modern Tort Law: Liability and Litigation § 35:20 (2d ed. 2023).

impute to a person the commission of a crime, or to subject him to public ridicule, ignominy, or disgrace, is actionable of itself"[94] and "[a]ny false and malicious writing published of another is libelous *per se,* when its tendency is to render him contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him."[95]

In contrast, we have indicated words are defamation per quod if innuendo or explanation is necessary to make a statement clear and understandable or where a communication is ambiguous or meaningless unless explained, or prima facie innocent, but capable of defamatory meaning.[96]

The theory animating the distinction in the treatment of damages in per se versus per quod defamation is that words classified as defamatory per se are so obviously harmful that no proof of damage ought to be required.[97] The common law of defamation allows recovery of purportedly compensatory damages without any evidence whatsoever of actual loss, if the defamation is deemed per se.[98]

[23] When the defamation is deemed to be per quod, though, the special damages requirement imposes a much higher threshold than showing actual loss. Special damages are those capable of accurate determination by some means other than the opinion of the judge or jury.[99] Section

---

[94] *World Publishing Co. v. Mullen*, 43 Neb. 126, 131-32, 61 N.W. 108, 109 (1894). See, also, *K Corporation v. Stewart*, 247 Neb. 290, 526 N.W.2d 429 (1995).

[95] *Williams v. Fuller, supra* note 92, 68 Neb. at 357, 94 N.W. at 119. See, also, *K Corporation v. Stewart, supra* note 94; *Heckes v. Fremont Newspapers, Inc.*, 144 Neb. 267, 13 N.W.2d 110 (1944).

[96] *Matheson v. Stork, supra* note 93.

[97] See Smolla, *supra* note 93, § 6:34.

[98] See *Gertz v. Robert Welch, Inc., supra* note 11.

[99] See *Hatcher v. McShane*, 12 Neb. App. 239, 670 N.W.2d 638 (2003). See, also, *Southwell v. DeBoer*, 163 Neb. 646, 80 N.W.2d 877 (1957).

25-840.01(1) states in part, "The term special damages, as used in this section, shall include only such damages as plaintiff alleges and proves were suffered in respect to his or her property, business, trade, profession, or occupation as the direct and proximate result of the defendant's publication." Special damages is a subset of actual harm, as actual harm is supported by evidence of injury, but the injury need not be pecuniary loss.[100] "[T]he only function of the special damages requirement is to protect a defendant from being caught by surprise, in cases in which the defendant could not have predicted that some readers would have a diminished view of the plaintiff's reputation from the face of the publication."[101] When a plaintiff is able to plausibly plead and prove special damages, the various "'per se'" rules do not matter, because the pleading and proving of special damages will render the statement actionable.[102]

It has been criticized that the traditional per se versus per quod requirements respecting damages

> put the plaintiff in a sort of all or nothing game with regard to proof of injury: Either special harm was required, in which case the plaintiff was faced with the harsh task of demonstrating pecuniary loss, or damages were presumed, in which case the plaintiff had no burden whatsoever regarding evidence of injury.[103]

The Restatement (Second) of Torts takes the position that the distinction between per se and per quod actions is no longer tenable, and all libel is actionable "irrespective of special harm."[104]

[24] We did not decide in *Moats* to go in the opposite direction of the Restatement and hold that special damages

---

[100] See Rodney A. Smolla, Law of Defamation § 9:35 (2d ed. 2022).

[101] *Id.*, § 7:23 at 7-52 to 7-53.

[102] *Id.*, § 7:5 at 7-9.

[103] See Smolla, *supra* note 93, § 6:34.

[104] Restatement (Second) of Torts § 569 at 182 (1977).

are required to state a claim for all defamation actions, even those that are per se. [105] And we find support for the premise that pleading and proving special damages is not an additional hurdle that a plaintiff in a public libel action must overcome. The U.S. Supreme Court has been clear as to what the Constitution requires to balance the plaintiff's rights against the First Amendment's protections of public debate. Pleading and proving special damages is not one of the higher barriers the Court has held the public libel plaintiff must surmount.

The Party admits that *Moats* is the only authority it could find to support its argument that Palmtag was required to plead and prove special damages in her per se public libel action. The district court was correct that *Moats* contains a misstatement. We did not explicitly say in *Moats* that a plaintiff in a public defamation case must always plead special damages regardless of the per se versus per quod nature of the statements. Nevertheless, we made the overly broad statement that "[t]he plaintiff in a 'public-libel' action must . . . establish special damages."[106]

The breadth of that statement had little connection to the analysis and holding of the case. The appeal involved a per quod public libel action. We concluded that "[*b*]*ecause the publications at issue were not defamatory per se*, it was necessary for [the plaintiff] to plead the defamatory nature of the words and special damages to properly plead his defamation per quod claims."[107] Furthermore, the cases we cited in *Moats* for the broad statement at issue in no way suggest the per se/per quod distinction has been eradicated such that special damages are always required to state a claim in any kind of public libel action.

---

[105] See *Moats v. Republican Party of Neb., supra* note 1.

[106] *Id*. at 422, 796 N.W.2d at 594.

[107] *Id*. at 423, 796 N.W.2d at 594 (emphasis supplied).

We find no merit to the Party's argument that even for defamation per se, the plaintiff in a public libel action must plead and prove special damages. To the extent *Moats* suggested otherwise, we disapprove of it. We do not at this time consider the Restatement's suggestion that the special damages requirement should be eradicated altogether, as we are not presented with a per quod action.

[25] A plaintiff in a per se public libel action is not required to plead and prove special damages to state a claim. As Palmtag's action was per se, the court did not err in determining that to overcome the Party's motion for summary judgment, Palmtag was not required to present a genuine issue that she incurred special damages.

## VI. CONCLUSION

Viewing the record in the light most favorable to Palmtag as the nonmoving party and drawing all reasonable inferences in her favor, we determine Palmtag presented sufficient evidence upon which a jury could find by clear and convincing evidence that the elements of public figure defamation were met. But a jury might also find that Palmtag's evidence did not reach the level of clear and convincing evidence. Because this presents a genuine issue of material fact, we reverse the judgment of the district court granting summary judgment in favor of the Party. We remand the cause for further proceedings consistent with this opinion.

Reversed and remanded for
further proceedings.

Funke, J., not participating.