Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/20/2024 09:09 AM CDT

Ronnfeldt Farms, Inc., a Nebraska corporation, appellant and cross-appellee, v. Jason Arp, Knee Deep, LLC, a Nebraska limited liability company, Brian Frost, and Frosty's Dragline, LLC, a Nebraska limited liability company, appellees and cross-appellants.

___ N.W.3d ___

Filed September 20, 2024.    No. S-23-116.

1. **Summary Judgment: Appeal and Error.** An appellate court reviews rulings on a motion for summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

2. **Summary Judgment.** Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

3. **Summary Judgment: Proof.** The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.

4. **Summary Judgment: Appeal and Error.** An appellate court may affirm summary judgment on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon.

5. **Negligence.** Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.

6. ____. In a negligence case, determining the standard of care to be applied in a particular case is a question of law.

7. ____. In a negligence case, the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact.

8. ____. In a negligence case, a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard.

9. ____. The duty in a negligence case is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk.

10. **Negligence: Words and Phrases.** In negligence cases, the standard of care is typically general and objective and is often stated as the reasonably prudent person standard, or some variation thereof; i.e., what a reasonable person of ordinary prudence would have done in the same or similar circumstances.

11. **Negligence.** The duty to use reasonable care does not exist in the abstract, but must be measured against a particular set of facts and circumstances.

12. **Negligence: Proof.** To prevail in any negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and resulting damages.

13. **Negligence.** When determining whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence.

14. ____. Deciding what is reasonably foreseeable generally involves common sense, common experience, and application of the standards and behavioral norms of the community.

15. ____. Because the extent of foreseeable risk depends on the specific facts of the case, it cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable.

16. ____. Analyzing foreseeability requires consideration of what the defendants knew, when they knew it, and whether a reasonable person would infer from those facts that there was a danger.

17. ____. Because foreseeability depends on the specific facts of the case, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter.

18. **Summary Judgment: Pleadings.** The pleadings frame the issues to be considered on a motion for summary judgment.
19. **Breach of Contract: Expert Witnesses: Proof.** When the customary standard of care in a particular industry is outside the common knowledge and experience of ordinary persons, it will generally need to be established by expert testimony.
20. **Negligence: Evidence.** Evidence of the ordinary practice or uniform custom of persons performing acts like those alleged to be negligent is generally considered to be competent evidence of the relevant standard of care.
21. **Negligence.** Evidence of a defendant's personal practice or routine does not necessarily establish the customary practice or standard of care in the industry.
22. **Summary Judgment: Appeal and Error.** It is a well-settled principle that an appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court, but this principle does not prevent an appellate court from reviewing an alternative ground for granting summary judgment that was presented to the trial court but not passed upon.
23. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Petition for further review from the Court of Appeals, PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges, on appeal thereto from the District Court for Burt County, BRYAN C. MEISMER, Judge. Judgment of Court of Appeals affirmed in part, and in part reversed and remanded with directions.

Stephen D. Mossman and Andrew R. Spader, of Mattson Ricketts Law Firm, for appellant.

Joel Bacon and Joel D. Nelson, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., and David V. Drew, of Drew Law Firm, P.C., L.L.O., for appellees.

CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

STACY, J.

After a swine producer experienced a disease outbreak in its sow facility, it sued two manure management companies,

alleging the outbreak was caused by the companies' failure to follow certain biosecurity protocols when pumping manure. The complaint sought damages of $1.5 million under breach of contract and negligence theories.

The swine producer's claims against one of the manure management companies were eventually dismissed with prejudice, and the remaining manure management company successfully moved for summary judgment on both theories of recovery. The swine producer appealed, and the manure management company cross-appealed. In a published opinion, the Nebraska Court of Appeals affirmed in part and in part reversed the summary judgment, and remanded the cause for further proceedings on some of the negligence claims.[1] It declined to address the cross-appeal, which asserted an alternative basis for affirming summary judgment on the negligence claims.

We granted further review. For reasons we will explain, we affirm in part and in part reverse the Court of Appeals' decision, and remand the cause with directions to affirm summary judgment.

## I. BACKGROUND

The factual record in this appeal is limited to the pleadings and the evidence adduced by the parties on summary judgment, which we construe in the light most favorable to the nonmoving party.[2] Except as otherwise indicated, the following facts are uncontroverted.

Ronnfeldt Farms, Inc. (RFI), is a swine producer that owns and operates a sow facility in Burt County, Nebraska. Jason Arp owns and operates a manure management company, Knee Deep, LLC (collectively Arp), that contracts with swine producers, cattle producers, and dairies to pump manure.

---

[1] See *Ronnfeldt Farms v. Arp*, 32 Neb. App. 490, 1 N.W.3d 540 (2023).

[2] See, e.g., *Woodward v. Saint Francis Med. Ctr.*, 316 Neb. 737, 6 N.W.3d 794 (2024); *Palmtag v. Republican Party of Neb.*, 315 Neb. 679, 999 N.W.2d 573 (2024) (appellate court reviews grant of summary judgment de novo, viewing record in light most favorable to nonmoving party).

Beginning in 2016 and every fall thereafter, RFI orally contracted with Arp to pump manure from pits under RFI's sow facility and apply it to nearby fields as fertilizer.

In the fall of 2020, RFI informed Arp it wanted the annual pumping at the sow facility to be completed by a certain date in early November. To meet the requested deadline, Arp asked Brian Frost, who owns and operates a manure management company called Frosty's Dragline, LLC (collectively Frost), to assist Arp's crew. Arp and Frost were long-time friends and had a history of assisting one another on large or time-sensitive pumping jobs; they had no formal arrangement but typically "settled up" at the end of each year. Frost orally agreed to assist Arp with the 2020 pumping job at RFI's sow facility. RFI was aware that Arp was asking another crew to assist with pumping, and it approved of that arrangement.

Shortly before pumping began at the sow facility, a representative of RFI texted Arp to learn the name of the pumping crew that would be assisting Arp and to ask whether that crew was "aware of the [b]iosecurity expectations before, during and on completion for equipment, personnel staying out of barn . . . and whatnot?" Arp replied, "They are aware of [b]iosecurity, Brian [F]rost is his name. I will stand behind him, he's a good guy and does things the right way. He will do whatever I tell him to do." After this text exchange, RFI relied exclusively on Arp to communicate with Frost about RFI's specific biosecurity protocols.

## 1. Biosecurity Protocols

Swine producers monitor biosecurity closely to prevent the spread of disease, and biosecurity protocols are generally more stringent at sow facilities than at hog finishing facilities. Biosecurity protocols at sow facilities are "ever-changing" and differ from facility to facility. The person in charge of biosecurity at RFI's sow facility explained, "Everybody's different. If I told you what the gold standard was, the next guy would tell you it's totally different."

Because specific biosecurity expectations vary from one facility to the next, it is customary for producers and contract manure companies to communicate proactively about biosecurity expectations at each facility. Educational materials relied upon by all parties in this case describe the following typical communication practices for producers:

> If a custom pumping crew is handling a farm's manure, communicating clearly up front to convey expectations and concerns to them is key for the farm owner or operator. A producer should feel free to ask [the pumping crew] where they've been prior to coming to [the producer's] site and discuss [the producer's] expectations related to biosecurity. It's best to be present when they show up to pump so that the area where they should travel, protective clothing they should use, and methods for cleaning equipment before and after pumping can be conveyed.

The same educational materials describe the customary communication practices for contract manure pumpers:

> Custom manure haulers have the opportunity to be very proactive about biosecurity, too. If a producer doesn't offer up information about their biosecurity practices and requirements, it's a good idea to ask what they require of visitors to maintain their farm's biosecurity. Be prepared to tell [the producer] where you've been, when you were there, how you cleaned and disinfected equipment, and what the disease status of previous sites might have been. Confirm the [producer's] preferred routes for you to enter and exit their site, ask where their line or lines of separation are, and wear protective coveralls, boots, etc. that you can leave at the site when you depart. And finally, you should have a protocol in place for cleaning and disinfecting equipment between sites, which may include some scheduled downtime for equipment to ensure that disease-causing organisms are not persisting in or on equipment.

RFI's representative testified that in November 2020, the specific biosecurity protocols at its sow facility (1) required contract manure pumpers to follow the "normal" procedures of cleaning, disinfecting, and drying all equipment between jobs; (2) prohibited pumping crews from entering the sow barns; and (3) prohibited pumping at the sow facility after pumping at another hog facility. According to RFI, if a crew had previously pumped hog manure, it was not allowed to enter RFI's sow facility unless it first pumped cattle manure; RFI considered pumping cattle manure to be the most effective way to "flush" hog manure and related diseases from the pumping equipment. RFI's biosecurity protocols did not require any downtime between pumping jobs if the crew and equipment were coming directly from a cattle facility. The specific biosecurity protocols for RFI's sow facility were unwritten, but RFI representatives testified that Arp was verbally advised of the protocols in 2016 and was reminded of them each year thereafter.

Arp agreed that when he began pumping for RFI in 2016, he was given verbal instructions on the specific biosecurity protocols to be followed at the sow facility. But Arp expressly denied that RFI ever informed him of a protocol that prohibited pumping hog manure before coming to RFI's sow facility. Instead, Arp claims he was told that RFI required contract manure pumpers at the sow facility to (1) stay out of the barns; (2) clean, disinfect, and dry all equipment; and (3) observe 48 hours of downtime between pumping jobs. Arp described these protocols as "usual" in the industry and testified that he generally followed such protocols whether he was pumping manure for a swine producer, a cattle feedlot, or a dairy. Arp testified that he verbally communicated these biosecurity requirements to Frost several days before pumping started at RFI.

Frost testified that when Arp asked him to assist with pumping at RFI's sow facility, Frost told Arp that his crew

was pumping manure at a hog finishing facility and Frost asked Arp "what needed [to be] done prior to coming" to RFI's sow facility. According to Frost, Arp told him that all equipment had to be "cleaned, dried, and disinfected," the crew should observe a downtime period of either 24 or 48 hours, and the pumping crew had to stay out of the barns. Frost testified he typically followed similar protocols when pumping manure for other customers and when pumping for his own hog finishing operation. Before arriving at RFI's sow facility, Frost cleaned all the equipment, disinfected it twice, and waited at least 48 hours before his crew began pumping. Frost testified he was being "extra vigilant" in disinfecting twice because he knew the crew was "going to a sow farm. That was the only reason."

Before pumping began at RFI's sow facility in November 2020, there was no direct communication between RFI representatives and Frost regarding RFI's specific biosecurity expectations or anything else. Instead, RFI relied on Arp to communicate with Frost about all aspects of assisting with pumping at RFI's sow facility, including biosecurity. Similarly, Frost relied on Arp to communicate directly with RFI, and Frost believed Arp had informed RFI that Frost's crew was coming directly from a hog finishing facility. But the undisputed evidence shows that although Arp told RFI that Frost was coming to the sow facility directly from another pumping job, Arp did not tell RFI that Frost was pumping at a hog finishing facility, and RFI did not ask.

## 2. Pumping and Disease Outbreak

From approximately November 6 to 9, 2020, Arp's crew and Frost's crew pumped approximately 2.3 million gallons of manure from the pits under the gestation barn at RFI's sow facility and injected the manure into neighboring fields. On the day pumping was scheduled to begin, Arp's crew arrived first. An RFI representative met the crew at the gate and

asked where they had last pumped; Arp's crew said they had last pumped at a dairy farm. RFI representatives did not meet Frost's crew at the gate and instead allowed Arp's crew to do so. But RFI representatives testified that if they had known Frost's crew would be coming directly from pumping at a hog finishing facility, they would have denied the crew entry.

A few days after pumping was complete, some of the sows in the farrowing barn at RFI's sow facility began to show signs of illness and tested positive for a serious respiratory disease called porcine reproductive and respiratory syndrome (PRRS). Evidence showed that PRRS can be transmitted through physical or airborne contact and can be carried into swine barns by humans, animals, rodents, birds, insects, vehicles and equipment, supplies, semen, and dust in the air. There was also evidence the virus can be spread through manure pumping.

RFI conducted an audit to identify the source of the PRRS outbreak. After the audit, RFI's veterinary expert testified there was a "high likelihood" the manure pumping crew introduced the virus.

After learning of the PRRS outbreak at RFI, Frost obtained a sample from the manure pit where his crew had pumped immediately before pumping at RFI. When Frost had the sample tested, the PRRS virus was detected, but the particular strain was not sequenced, so it is not known whether it was similar to the strain involved in the outbreak at RFI. It is undisputed that Frost had no knowledge of any illness at the hog finishing facility before he began pumping at RFI's sow facility. Evidence in the record shows that a random sampling of swine barns in northeastern Nebraska would likely show PRRS in anywhere from 10 to 50 percent of barns, whether or not the swine were showing symptoms. In the fall of 2019, RFI experienced a PRRS outbreak in some of its other swine facilities and attributed that outbreak to "area spread" from another swine producer pumping infected manure into nearby fields.

### 3. Complaint and
### Summary Judgment

#### (a) Complaint

In February 2021, RFI filed suit against Arp and Frost in the district court for Burt County. The complaint was styled as two causes of action, one alleging breach of contract and the other alleging negligence.

Regarding breach of contract, the complaint alleged that Frost was acting as a subcontractor of Arp, an allegation that both Arp and Frost expressly denied. The complaint alleged that Arp and Frost orally agreed to pump manure at RFI's sow facility, and to follow RFI's specific biosecurity protocols. The complaint alleged the contract was breached when Arp and Frost failed to follow RFI's specific biosecurity protocols prohibiting crews from pumping at RFI's sow facility immediately after pumping at another hog finishing facility.

Regarding negligence, the complaint alleged that both Arp and Frost owed RFI a duty to follow RFI's specific biosecurity protocols when pumping at its sow facility. It also alleged, more generally, that Arp and Frost "owed a duty to [RFI] to conduct manure pumping operations . . . in accordance with safe biosecurity practices." As relevant to the issues raised on appeal, the complaint alleged that Frost breached those duties by

- pumping manure at a hog finishing facility immediately before pumping at RFI's sow facility and using the same equipment and employees at both facilities; and
- failing to inform RFI that the manure pumping crew had pumped at a hog finishing facility before pumping at RFI's sow facility.

Arp and Frost filed separate answers. Both parties admitted they had a duty to exercise reasonable care and to comply with generally accepted industry standards when pumping manure, and both alleged they had done so when pumping at RFI's sow facility. Both denied liability for the PRRS outbreak and alleged several affirmative defenses, including

that RFI's contributory negligence proximately caused the PRRS outbreak.

After conducting discovery, Frost moved for summary judgment on all claims. Shortly thereafter, Arp and RFI reached a settlement, and all claims against Arp were dismissed with prejudice. The lawsuit proceeded against only Frost and his company.

### (b) Frost's Summary Judgment Motion

At the summary judgment hearing, more than 60 exhibits were offered and received, including pleadings, written discovery responses, and discovery depositions of Frost, Arp, RFI's representatives, and RFI's experts. Both parties generally relied on the same exhibits to support and oppose summary judgment.

### (i) Breach of Contract Theory

Frost argued he was entitled to judgment as a matter of law on the breach of contract theory because the evidence conclusively showed he had no contractual or business relationship with RFI. In response, RFI initially argued there was a factual dispute about whether Frost was Arp's subcontractor, but during the summary judgment proceedings, RFI abandoned that theory and agreed there was no evidence to support it. In its place, RFI argued that Arp and Frost were engaged in a joint venture and that therefore, Arp's conduct could be imputed to Frost under both theories of recovery.[3]

### (ii) Negligence Theory

Frost also argued he was entitled to judgment as a matter of law on the negligence claims. Regarding the allegation that Frost breached the applicable standard of care by pumping manure at RFI's sow facility immediately after pumping at a

---

[3] See, generally, *Kohout v. Bennett Constr.*, 296 Neb. 608, 618, 894 N.W.2d 821, 829 (2017) (joint venture "is in the nature of a partnership"); *Soulek v. City of Omaha*, 140 Neb. 151, 155, 299 N.W. 368, 371 (1941) (in joint ventures, "the negligence of one will be imputed to both").

hog finishing facility, Frost argued the evidence demonstrated either that he owed no such duty to RFI or that he did not breach such duty as a matter of law. Among other things, Frost argued there was no evidence that he was told RFI had a specific biosecurity protocol prohibiting crews from pumping at another swine facility before coming to its sow facility, and there was no evidence that such a biosecurity protocol was customary in the industry.

Regarding the allegation that Frost breached the applicable standard of care by not informing RFI that his crew had just pumped at a hog finishing facility, Frost again argued that either he owed no such duty to RFI or, alternatively, he did not breach such duty because the undisputed evidence showed that he informed Arp about his pumping history and understood that Arp had communicated that information to RFI. Among other things, Frost argued it was not reasonably foreseeable that Arp would fail to tell RFI about Frost's pumping history.

In response, RFI argued that Frost owed RFI a duty of reasonable care when pumping manure at its sow facility. And it argued that even if the evidence showed that Frost was not told about all of RFI's specific biosecurity expectations, there were still genuine issues of material fact bearing on whether Frost breached the duty of reasonable care by pumping at RFI's sow facility immediately after pumping at a hog finishing facility and/or failing to inform RFI he had just pumped at a hog finishing facility. We discuss the evidence relied upon by RFI for these arguments later in our analysis.

### (iii) Proximate Cause

Finally, on the issue of proximate cause, Frost argued that even if there was a genuine factual dispute as to whether Frost breached a duty of care owed to RFI, the record showed Frost was still entitled to summary judgment because RFI could not, as a matter of law, prove the PRRS outbreak was proximately caused by manure pumping. Frost's causation

argument was twofold. First, he argued that RFI's causation evidence was based on nothing more than a circumstantial temporal correlation and thus was insufficient as a matter of law to create a genuine issue of material fact for purposes of summary judgment.[4] But Frost's primary causation argument related to a claim of spoliation. He argued that RFI failed to preserve onsite security camera footage showing activity at the sow facility immediately before, during, and after the pumping. Frost claimed the video footage contained relevant evidence showing other potential biosecurity failures that may have caused the PRRS virus to be introduced, and he argued that RFI's spoliation warranted an inference that the video evidence would have been favorable to Frost.

In response, RFI argued that its expert's causation opinion was based on more than just a temporal correlation and thus created a material factual dispute about the cause of the PRRS outbreak that precluded summary judgment on the issue of causation. Additionally, RFI argued there was insufficient evidence to support a finding of intentional spoliation, and thus no adverse inference was warranted.

(c) Order on Summary Judgment

The trial court granted Frost's motion for summary judgment on both theories of recovery. Regarding the breach of contract claim, the trial court reasoned that Frost could not be liable to RFI because the evidence was undisputed there was no contractual relationship between Frost and RFI and there was no competent evidence to support a reasonable inference that Frost was acting as a subcontractor of Arp or engaged in a joint venture with Arp.

---

[4] See, generally, *McGill Restoration v. Lion Place Condo. Assn.*, 309 Neb. 202, 238, 959 N.W.2d 251, 278 (2021) ("[i]t is well settled that a causation opinion based solely on a temporal relationship is unreliable, because it is not derived from the scientific method [and] it is not based upon sufficient facts or data"); *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015), *disapproved on other grounds, Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019).

Regarding the negligence claim, the trial court reasoned that although RFI and Arp had an established business relationship, RFI had no business relationship with Frost, and that therefore, it was "not reasonable to expect Frost to go beyond Arp and coordinate directly with [RFI]." The court ultimately concluded that "any duty owed by [Frost] in this matter is limited to their duty owed to [Arp] and does not extend to [RFI] in this matter." Because the district court resolved the negligence claim on the issue of duty, it did not address any of Frost's other arguments.

### 4. Court of Appeals

RFI appealed the summary judgment, assigning 12 errors. Frost cross-appealed, assigning that the district court erred in failing to find that RFI could not establish that Frost's negligence, if any, was a proximate cause of its damages.

Many of RFI's assigned errors related to the trial court's rulings on the breach of contract claim. The Court of Appeals affirmed the grant of summary judgment on that claim. This aspect of the Court of Appeals' decision is not challenged on further review, and we do not discuss it further.

### (a) Arguments on Appeal

Regarding the negligence claims, RFI characterized the trial court's ruling as a finding that Frost "owed no duty to [RFI] under any circumstances."[5] RFI argued that the no-duty determination was erroneous, because Frost's conduct in pumping manure at RFI created a risk of physical harm to RFI's sows, and that Frost thus owed RFI a duty of reasonable care under the duty framework of the Restatement (Third) of Torts.[6]

---

[5] Brief for appellant at 31.

[6] See *Bell v. Grow With Me Childcare & Preschool*, 299 Neb. 136, 907 N.W.2d 705 (2018) (recognizing that under duty framework of Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010), duty of reasonable care is expressly conditioned on actor's having engaged in conduct that creates risk of physical harm). Accord *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010).

Additionally, RFI argued there were genuine issues of material fact as to whether Frost breached the duty of reasonable care by pumping at RFI's sow facility immediately after pumping at a hog finishing facility, and/or by failing to inform RFI that his crew had just pumped at a hog finishing facility.

In response, Frost's appellate brief generally argued the district court's duty analysis was correct and should be affirmed. Alternatively, Frost argued that even if he owed RFI a duty of reasonable care, RFI could not establish that Frost breached that duty in any of the ways alleged in the operative complaint. And in his cross-appeal, Frost argued that even if there was a factual dispute as to whether any duty of reasonable care was breached, the district court erred in failing to grant summary judgment on the alternative theory that RFI could not establish causation as a matter of law.

### (b) Court of Appeals Reverses on Duty and Finds Factual Disputes Regarding Breach

The Court of Appeals agreed with RFI that the district court erred in ruling that Frost owed no duty to RFI. Citing *A.W. v. Lancaster Cty. Sch. Dist. 0001*,[7] the Court of Appeals reasoned that "[a]s an actor at [RFI's] facility, Frost had a general duty to exercise reasonable care when its conduct created a risk of physical harm."[8] The court also noted that Frost's answer admitted owing a duty to exercise reasonable care when pumping manure for third parties and thus concluded "the district court erred in ruling Frost owed no duty to [RFI]."[9]

The Court of Appeals described RFI's primary claim against Frost as a "limited claim of independent negligence"[10] premised on the allegation that Frost "breached [the] duty of care when pumping at [RFI's sow facility] immediately after

---

[7] *A.W., supra* note 6.

[8] *Ronnfeldt Farms, supra* note 1, 32 Neb. App. at 508, 1 N.W.3d at 555.

[9] *Id.* at 509, 1 N.W.3d at 555.

[10] *Id*. at 511, 1 N.W.3d at 557.

pumping at a different hog farm."[11] Regarding such claim, the Court of Appeals stated, "The standard of care owed by a manure pumping company to the owner of a facility being pumped and whether the pumper's actions satisfied that standard are issues of fact for the jury to resolve."[12] Then, without referring to any particular evidence in the record, the Court of Appeals concluded there were genuine factual disputes precluding summary judgment on that claim, reasoning:

Frost [argues] that even if [he] owed [RFI] a duty, no breach of the standard of care occurred. But in order to determine whether appropriate care was exercised, *the fact finder* must assess the foreseeable risk at the time of the defendant's negligence. . . . Courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. . . . We find that reasonable minds could differ on whether Frost exercised appropriate care, and as such, we leave this issue to be resolved by a fact finder.[13]

However, the Court of Appeals expressly agreed with the district court that "Frost did not necessarily have a duty to inquire of [RFI] as to its biosecurity protocols," reasoning:

Relying on Arp alone for that information was sufficient unless the general standard of care would demonstrate that Frost knew or should have known that additional steps should have been taken as part of a general standard of care in the industry as it relates to the pumping of manure at a sow barn.[14]

The Court of Appeals ultimately affirmed the district court's grant of summary judgment on the breach of contract claim and on what it described as the negligence claims

---

[11] *Id*. at 509, 1 N.W.3d at 556.

[12] *Id.* at 508, 1 N.W.3d at 555.

[13] *Id*. at 510, 1 N.W.3d at 556 (emphasis in original).

[14] *Id*. at 509, 1 N.W.3d at 555-56.

seeking to hold Frost "liable for Arp's . . . alleged negligent behavior."[15] But it reversed that "portion of the court's order granting summary judgment on [RFI's] independent negligence claim against Frost,"[16] reasoning that determinations of "[w]hat standard of care was required of Frost and whether Frost's actions or inactions constituted a breach of that standard are questions for the finder of fact."[17] The Court of Appeals remanded the cause "for further consideration of the remaining issues . . . related to [RFI's] independent negligence claim."[18]

### (c) Court of Appeals Declines
### to Address Cross-Appeal

After reversing summary judgment on the "independent negligence claim"[19] and remanding the cause for further proceedings, the Court of Appeals declined to address Frost's cross-appeal, which asserted that the district court erred in failing to grant summary judgment on the alternative theory that RFI could not establish causation as a matter of law. The Court of Appeals explained its reasoning as follows:

> The district court did not reach the issue of causation or the issue of evidence preservation in its order granting summary judgment. Based on the conclusion the court made, it was not necessary for the court to consider these issues. We decline to consider these issues that were not addressed by the district court. An appellate court will not consider an issue on appeal that was not passed upon by the trial court. *Hinson v. Forehead*, 30 Neb. App. 55, 965 N.W.2d 793 (2021).[20]

---

[15] *Id*. at 512, 1 N.W.3d at 557.

[16] *Id.*

[17] *Id.* at 511, 1 N.W.3d at 557.

[18] *Id.* at 512, 1 N.W.3d at 557.

[19] *Id.*

[20] *Id*. at 511, 1 N.W.3d at 557.

We granted Frost's petition for further review, and both parties submitted additional briefs addressing the issues raised in Frost's petition.[21] RFI did not seek further review to challenge any other aspect of the Court of Appeals' decision.

## II. ASSIGNMENTS OF ERROR

On further review, Frost assigns and argues that the Court of Appeals erred in (1) treating issues of duty and standard of care as factual questions rather than legal questions, (2) applying an "ordinary" duty of reasonable care, (3) concluding there were genuine issues of material fact regarding whether Frost breached the standard of care, and (4) declining to reach Frost's cross-appeal on causation.

Based on these assignments, we understand Frost to challenge only that portion of the Court of Appeals' decision that reversed summary judgment on the "independent negligence claim"[22] against Frost. It appears from the briefing on further review that the parties read the Court of Appeals' opinion to have reversed summary judgment on two of RFI's negligence claims: the claim that Frost breached the standard of care by pumping manure at a sow facility immediately after pumping manure at hog finishing facility and the claim that Frost breached the standard of care by failing to inform RFI that it had just pumped at a hog finishing facility. We limit our analysis accordingly.

## III. STANDARD OF REVIEW

[1] An appellate court reviews rulings on a motion for summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[23]

---

[21] See Neb. Ct. R. App. P. § 2-102(H) (rev. 2022) (authorizing additional briefs when further review is granted).

[22] *Ronnfeldt Farms, supra* note 1, 32 Neb. App. at 512, 1 N.W.3d at 557.

[23] See *Simpson v. Lincoln Public Schools*, 316 Neb. 246, 4 N.W.3d 172 (2024).

## IV. ANALYSIS

[2,3] Because this appeal involves rulings on summary judgment, we begin by recalling the standards that govern our de novo review. Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[24] The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial.[25] If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.[26] If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[27]

[4] An appellate court may affirm summary judgment on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon.[28]

## 1. DUTY

In his first two assignments of error, Frost asserts the Court of Appeals misstated and misapplied certain duty principles.

---

[24] *Palmtag, supra* note 2.

[25] *Id.*; *Clark v. Scheels All Sports*, 314 Neb. 49, 989 N.W.2d 39 (2023).

[26] *Id*.

[27] *Id*.

[28] See, *Schuemann v. Timperley*, 314 Neb. 298, 989 N.W.2d 921 (2023); *Choice Homes v. Donner*, 311 Neb. 835, 976 N.W.2d 187 (2022).

In the sections that follow, we address each of these assignments and conclude neither has merit.

### (a) Court of Appeals Did Not
### Misstate Duty Principles

Frost argues the Court of Appeals "inappropriately characterized [the] standard of care as a fact question"[29] when it stated: "The standard of care owed by a manure pumping company to the owner of a facility being pumped and whether the pumper's actions satisfied that standard are issues of fact for the jury to resolve."[30] Frost contends the applicable standard of care is not an issue of fact, but, rather, is a question of law, and he cites to *Reiber v. County of Gage*[31] for the proposition that "the existence of a duty and the identification of the applicable standard of care are questions of law."

But Frost quotes only part of the principle we recited in *Reiber*, where we explained:

> While the existence of a duty and the identification of the applicable standard of care are questions of law, the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact. *To resolve the issue, a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard.*[32]

[5-8] *Reiber* combines several settled principles: (1) whether a legal duty exists for actionable negligence is a question of

---

[29] Brief for appellee Frost in support of petition for further review at 7 (emphasis omitted).

[30] *Ronnfeldt Farms, supra* note 1, 32 Neb. App. at 508, 1 N.W.3d at 555.

[31] *Reiber v. County of Gage*, 303 Neb. 325, 336, 928 N.W.2d 916, 925 (2019).

[32] *Id*. at 336-37, 928 N.W.2d at 925 (emphasis supplied).

law dependent on the facts in a particular situation,[33] (2) determining the standard of care to be applied in a particular case is a question of law,[34] (3) the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact,[35] and (4) a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard.[36]

[9,10] We have stated, as a general proposition, that the duty in a negligence case is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk.[37] And we have explained that the applicable standard of care "is necessarily articulated in general terms [because] 'it is impossible to prescribe definite rules of conduct in advance for every combination of circumstances that may arise.'"[38] As such, "'the law resorts to formulae which state the standard [of care] in broad terms without attempt to fill [in the] detail.'"[39] The standard of care "is typically general and objective and is often stated as the reasonably

---

[33] See, *Porter v. Knife River, Inc.*, 310 Neb. 946, 970 N.W.2d 104 (2022); *A.W., supra* note 6.

[34] *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 262 Neb. 66, 628 N.W.2d 697 (2001). See *Murray v. UNMC Physicians*, 282 Neb. 260, 806 N.W.2d 118 (2011).

[35] See *Reiber, supra* note 31; *Green v. Box Butte General Hosp.*, 284 Neb. 243, 818 N.W.2d 589 (2012), *abrogated on other grounds, Clark, supra* note 25. See, also, *Murray, supra* note 34; *Cerny, supra* note 34.

[36] See, *Reiber, supra* note 31; *Cerny, supra* note 34. Accord *Green, supra* note 35, 284 Neb. at 256, 818 N.W.2d at 599 ("[i]t is for the finder of fact to resolve what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with that standard").

[37] See *A.W., supra* note 6.

[38] *Cerny, supra* note 34, 262 Neb. at 74, 628 N.W.2d at 704.

[39] *Id.*

prudent person standard, or some variation thereof; i.e., what a reasonable person of ordinary prudence would have done in the same or similar circumstances."[40]

So although Frost is correct that the applicable standard of care presents a question of law, it is also true that "a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard."[41] As such, when there is conflicting evidence as to what conduct the standard of care would require under the particular circumstances, it presents an issue for the fact finder to resolve.[42]

We do not read the Court of Appeals' opinion to have misstated these settled duty principles. The opinion described the applicable standard of care in general terms when it said "Frost owed a duty of reasonable care to [RFI]."[43] And when the opinion stated that "[t]he standard of care owed by a manure pumping company to the owner of a facility being pumped and whether the pumper's actions satisfied that standard are issues of fact for the jury to resolve,"[44] we read it to reflect the Court of Appeals' conclusion that the record contains material factual disputes regarding what conduct the standard of care would require under the particular circumstances.

As we explain later, our de novo review of the record leads us to a different conclusion about whether material factual

---

[40] *Id*. at 73, 628 N.W.2d at 703-04.

[41] *Reiber, supra* note 31, 303 Neb. at 336-37, 928 N.W.2d at 925. Accord, *Green, supra* note 35; *Cerny, supra* note 34.

[42] See *Murray, supra* note 34, 282 Neb. at 272, 806 N.W.2d at 126 (noting applicable standard of care is established by Nebraska Hospital-Medical Liability Act but when conflicting evidence is presented regarding customary practice in community, that is "a jury question"). Accord, *Green, supra* note 35; *Cerny, supra* note 34.

[43] *Ronnfeldt Farms, supra* note 1, 32 Neb. App. at 508, 1 N.W.3d at 555.

[44] *Id*.

disputes exist. But we reject Frost's assertion that the Court of Appeals' opinion misstated the applicable duty principles under Nebraska law.

### (b) Court of Appeals Did Not Misapply Duty of Reasonable Care

In his second assignment, Frost argues, "The Court of Appeals erred in concluding the ordinary duty to exercise reasonable care applied to [RFI's] attempt to hold [Frost] liable for following Arp's instructions."[45] We understand Frost to contend that because RFI entrusted Arp to instruct Frost regarding RFI's specific biosecurity protocols, and because Frost complied with Arp's instructions, Frost necessarily acted reasonably, and there is no need to determine whether his conduct otherwise conformed to the customary biosecurity standards that a reasonable manure pumping professional with similar training and experience would follow when pumping at a sow facility. According to Frost, applying a "ordinary" duty of reasonable care under such circumstances would "subject [defendants] to liability for simply following the instructions of the person they agreed to help."[46]

[11] We reject Frost's broad assertion that the duty of reasonable care does not apply merely because a defendant was following instructions. The duty to use reasonable care does not exist in the abstract, but must be measured against a particular set of facts and circumstances.[47] We find no support for Frost's contention that when considering what conduct the duty of reasonable care required in this case, the Court of Appeals should have focused exclusively on the fact that Frost was following instructions and need not have considered other facts and circumstances bearing on the applicable

---

[45] Brief for appellee Frost in support of petition for further review at 8.

[46] *Id*. at 10.

[47] See *Cerny, supra* note 34.

standard of care and whether Frost's conduct conformed to such standard.[48]

The specific biosecurity instructions that Arp gave to Frost are merely one of many facts and circumstances to be considered when determining what conduct the standard of care required under the particular circumstances and whether Frost's conduct conformed to that standard. On this record, Frost's argument that the duty of reasonable care should automatically be "scal[ed] back"[49] because he was merely following instructions is misplaced.

For the sake of completeness, we acknowledge that both Frost and RFI present various arguments focused on how the duty of reasonable care might be impacted by a determination that Arp and Frost entered into a formal legal relationship of one sort or another. We do not address these arguments because they are merely theoretical.[50] Although the trial court and the Court of Appeals agreed that RFI abandoned its subcontractor theory and failed to prove a joint venture theory, there has been no determination that Arp and Frost entered into any formal legal relationship.[51] Similarly, because the record and the parties' appellate briefing is silent on the issue, we express no opinion about whether there may be statutes, ordinances, regulations, or conditional use permits that impact the standard of care required under the particular circumstances of this case.

---

[48] See *id*. at 73, 628 N.W.2d at 704 (when determining standard of care, circumstances to be considered include whether "alleged tort-feasor possesses special knowledge, skill, training, or experience pertaining to the conduct in question that is superior to that of the ordinary person").

[49] Brief for appellee Frost in support of petition for further review at 10.

[50] See, e.g., *State v. Castillo-Rodriguez*, 313 Neb. 763, 986 N.W.2d 78 (2023) (not function of appellate courts to render advisory opinions).

[51] See *Saint James Apt. Partners v. Universal Surety Co*., 316 Neb. 419, 5 N.W.3d 179 (2024) (appellate court has discretion to decline to review all possible reasons supporting result if it concludes remand would be better means of resolving issues).

## 2. Breach

In his third assignment of error, Frost argues that "[e]ven assuming the Court of Appeals' duty analysis was correct, it erred in concluding there was a genuine issue of material fact on whether [Frost] breached the duty to exercise reasonable care."[52] Frost is critical of the Court of Appeals' opinion in this regard, suggesting it "addressed breach with a handwave"[53] and it "failed to explain what evidence created a genuine issue of material fact."[54] Since our review is de novo, we need not address this criticism. Instead, we conduct our own review of the record to determine whether there are genuine issues of material fact bearing on whether Frost breached the duty of reasonable care in any of the ways alleged in the operative complaint. First, we review the legal principles that govern our analysis.

### (a) Legal Principles Governing
### Breach of Duty

[12] To prevail in any negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and resulting damages.[55] As already explained, although the existence of a duty and the applicable standard of care are questions of law, "a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard."[56]

[13-17] When determining whether appropriate care was exercised, the fact finder must assess the foreseeable risk at

---

[52] Brief for appellee Frost in support of petition for further review at 10.

[53] *Id.*

[54] *Id.* at 11.

[55] *Porter, supra* note 33.

[56] *Reiber, supra* note 31, 303 Neb. at 336-37, 928 N.W.2d at 925.

the time of the defendant's alleged negligence.[57] Deciding what is reasonably foreseeable generally "involves common sense, common experience, and application of the standards and behavioral norms of the community."[58] Because the extent of foreseeable risk depends on the specific facts of the case, it cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable.[59] Analyzing foreseeability requires consideration of what the defendants knew, when they knew it, and whether a reasonable person would infer from those facts that there was a danger.[60] And because foreseeability depends on the specific facts of the case, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter.[61] Stated differently, foreseeability determinations can properly be made on summary judgment as a matter of law,[62] but only when reasonable minds "could not disagree about the unforeseeability of the risk of the harm incurred."[63]

### (b) De Novo Review of Evidence

[18] Because the pleadings frame the issues to be considered on a motion for summary judgment,[64] we limit our analysis to the allegations of RFI's complaint. As relevant to the issues raised on further review, the complaint alleged two ways in which Frost's independent conduct breached the duty of reasonable care: (1) pumping manure at a sow facility

---

[57] See *Pittman v. Rivera*, 293 Neb. 569, 879 N.W.2d 12 (2016).

[58] *A.W., supra* note 6, 280 Neb. at 212, 784 N.W.2d at 914.

[59] See *Pittman, supra* note 57.

[60] See *Thomas v. Board of Trustees*, 296 Neb. 726, 895 N.W.2d 692 (2017).

[61] See *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018).

[62] See *Latzel v. Bartek*, 288 Neb. 1, 846 N.W.2d 153 (2014).

[63] *Thomas, supra* note 60, 296 Neb. at 736, 895 N.W.2d at 700. Accord *Riggs v. Nickel*, 281 Neb. 249, 796 N.W.2d 181 (2011).

[64] *Clark, supra* note 25.

immediately after pumping at a hog finishing facility while using the same crew and equipment and (2) failing to inform RFI that Frost's crew had just pumped manure at a hog finishing facility.

Although the Court of Appeals' opinion appears to have addressed these allegations collectively, we analyze them individually. In the sections that follow, we review the evidence regarding both alleged breaches, and we ultimately conclude that no genuine issue of material fact exists as to either. As such, although our reasoning differs from that relied upon by the district court and the Court of Appeals, we ultimately agree with the district court that Frost is entitled to summary judgment as a matter of law on all the negligence claims alleged by RFI.

### (i) Pumping at Sow Facility After Pumping at Hog Finishing Facility

Frost admits he used the same crew and equipment to pump at RFI's sow facility after pumping at a hog finishing facility, but he argues there are several reasons why such conduct did not breach the applicable standard of care. We address only one of his arguments, because we find it dispositive.

Frost argues he could not have breached the standard of care by pumping manure at a sow facility immediately after pumping at a hog finishing facility, because the "requirement that manure contractors not come from another swine barn is a protocol [RFI] came up with; there is no evidence it was a general industry standard."[65] He contends that "to the extent an industry standard can be ascertained"[66] from the evidence on summary judgment, it showed the usual or customary practice for contract manure pumpers is to clean, disinfect, and dry their equipment and observe a period of downtime before pumping at another facility. Frost argues the evidence is undisputed that his conduct met or exceeded these customary

---

[65] Brief for appellee Frost at 11.

[66] *Id.* at 44.

industry standards, and RFI failed to produce any evidence of an industry standard prohibiting contract manure pumpers from pumping at a sow facility after pumping at a hog finishing facility.

[19,20] At trial, it would be RFI's burden to prove what type of conduct the applicable standard of care required under the particular circumstances of this case.[67] And when the customary standard of care in a particular industry is outside the common knowledge and experience of ordinary persons, it will generally need to be established by expert testimony.[68] Evidence of the ordinary practice or uniform custom of persons performing acts like those alleged to be negligent is generally considered to be competent evidence of the relevant standard of care.[69]

Our de novo review of the record shows Frost is correct that there is no evidence, expert or otherwise, of a common practice or uniform custom in the industry prohibiting contract manure pumpers from pumping at a sow facility immediately after pumping at a hog finishing facility. Instead, the evidence shows that the biosecurity practices in the industry vary widely and that the only uniform custom or practice is to clean and disinfect equipment and observe a period of

---

[67] See *Curran v. Buser*, 271 Neb. 332, 711 N.W.2d 562 (2006) (observing it is plaintiff's burden to prove what conduct is required by applicable standard of care).

[68] See *McGill Restoration, supra* note 4, 309 Neb. at 235, 959 N.W.2d at 276 ("[o]rdinarily, the standard of care for the rendering of services in the practice of a trade is outside the common knowledge and experience of ordinary persons and must, therefore, be established by expert testimony"). Accord *Anderson v. Babbe*, 304 Neb. 186, 933 N.W.2d 813 (2019) (to establish customary standard of care in particular case, expert testimony of customary practice among those in same industry is normally required).

[69] See *Wilbur v. Schweitzer Excavating Co.*, 181 Neb. 317, 325, 148 N.W.2d 192, 197 (1967) (to establish standard of care "evidence of the ordinary practice or of the uniform custom of persons in the performance of acts . . . like those alleged to be negligent is competent evidence").

downtime between pumping jobs. On this record, Frost pre-
sented a prima facie case showing he would be entitled to
judgment on this claim if the evidence were uncontroverted
at trial,[70] and the burden shifted to RFI to produce evidence
showing the existence of a material issue of fact that would
prevent judgment as a matter of law.[71]

But RFI does not direct us to any evidence in the record of
an industry standard or a uniform custom or practice prohibit-
ing contract manure pumpers from pumping at a sow facility
after pumping at a hog finishing facility. Instead, RFI argues
that reasonable inferences from testimony about Frost's per-
sonal practice creates "a dispute of material fact regarding
whether it is [an] industry standard to pump sow units before
finishing barns."[72] RFI cites to Frost's deposition testimony
that, with his own customers, he starts the pumping season at
a sow facility. But, as we explain, even giving RFI all reason-
able inferences from such evidence, we cannot agree this tes-
timony creates a material factual dispute about the applicable
standard of care.

[21] First, evidence of a defendant's personal practice or
routine does not necessarily establish the customary practice
or standard of care in the industry.[73] In the absence of evidence
suggesting that Frost's personal practice is also the customary
practice in the industry, such evidence is simply not relevant
to establishing the conduct required by the applicable stan-
dard of care.[74] Moreover, Frost did not testify about whether

---

[70] See *Palmtag, supra* note 2; *Clark, supra* note 25.

[71] See *id*.

[72] Reply brief for appellant at 13-14.

[73] See, e.g., *Curran, supra* note 67 (applicable standard of care not determined
by defendant physician's personal or customary routine, but by ordinary
practice among physicians in similar community engaged in similar
practice); *Eccleston v. Chait*, 241 Neb. 961, 969, 492 N.W.2d 860, 865
(1992) (defendant physician's personal practice or routine "irrelevant" as
standard for determining customary practice among similar professionals).

[74] See *id.*

his personal practice was prompted by biosecurity concerns, logistical concerns, customer preference, or something else. So, on this record, evidence that it is Frost's personal practice or routine to start his pumping season at a sow facility does not support a reasonable inference that there is an industry standard prohibiting contract manure pumpers from pumping at a sow facility after pumping at a hog finishing facility.

Because RFI produced no evidence of an industry custom or standard prohibiting contract manure pumpers from pumping at a sow facility after pumping at a hog finishing facility, Frost was entitled to judgment as a matter of law on RFI's claim that such conduct breached the standard of care. To the extent the Court of Appeals' opinion concluded otherwise, it is reversed.

### (ii) Failing to Inform RFI
### of Pumping History

Frost argues he is also entitled to summary judgment on RFI's claim that he breached the standard of care by failing to inform RFI that his equipment and crew had just come from pumping manure at a hog finishing facility. Frost does not dispute that it is customary for swine producers to ask contract manure pumpers where their crew and equipment have been and to communicate about any specific biosecurity protocols the producer wants the pumper to follow. Giving RFI every reasonable inference, we conclude, after a de novo review of the evidence, that it is also customary for contract manure pumpers to tell swine producers where they have been pumping and what steps they have taken to clean and disinfect their equipment, as well as to ask what the producer requires as far as biosecurity. Frost argues he is entitled to summary judgment because the undisputed evidence shows he did not breach such standards.

Frost points to uncontroverted evidence that (1) RFI and Arp had an established business relationship, (2) RFI entrusted Arp to communicate with Frost about RFI's biosecurity

expectations, and (3) Frost informed Arp several days before pumping at RFI's sow facility that he and his crew were pumping manure at a hog finishing facility, and Frost asked Arp what sort of biosecurity protocols RFI would require him to follow under the circumstances. The evidence is also undisputed that Frost believed Arp had communicated this information to RFI. Based on this evidence, Frost argues it was not reasonably foreseeable that Arp would fail to tell RFI about Frost's pumping history.[75]

We agree that this evidence, if uncontradicted at trial, would entitle Frost to judgment as a matter of law on RFI's claim that Frost breached the standard of care by failing to inform RFI that his pumping crew had been at a hog finishing facility. The burden thus shifted to RFI to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[76]

But RFI produced no evidence contradicting Frost's testimony that Frost informed Arp he was pumping at a hog finishing facility and no evidence suggesting that Frost had any reason to foresee that Arp would fail to communicate that information to his customer. Nor was there any evidence suggesting it was a customary practice, when assisting another pumping crew, to communicate directly with that pumper's customer about biosecurity expectations. Indeed, although there was evidence that Arp and Frost regularly assisted one another on large or time-sensitive pumping jobs, there was no evidence they ever communicated directly with one another's customers about biosecurity.

On this record, RFI failed to produce evidence showing the existence of a material issue of fact precluding summary

---

[75] See, e.g., *Matson v. Dawson*, 185 Neb. 686, 692, 178 N.W.2d 588, 592 (1970) ("person has no duty to anticipate negligence on the part of others, and, in the absence of notice or knowledge to the contrary, is entitled to assume, and to act on the assumption, that others will exercise ordinary care").

[76] See *Palmtag, supra* note 2.

judgment on RFI's claim that Frost breached the standard of care by failing to inform RFI that he and his crew had pumped manure at a hog finishing facility. Frost was entitled to summary judgment on this claim, and to the extent the Court of Appeals' opinion can be read to have concluded otherwise, it is reversed.

### 3. Declining to Consider Cross-Appeal

In his final assignment of error, Frost argues the Court of Appeals erred by declining to address his cross-appeal. He contends that since the cross-appeal was asserting an alternative ground for granting summary judgment, the Court of Appeals should have examined the merits of the cross-appeal before it reversed the summary judgment and remanded the cause for further proceedings.

The only reason given by the Court of Appeals for declining to address the cross-appeal was that "[t]he district court did not reach the issue of causation or the issue of evidence preservation in its order granting summary judgment" and appellate courts "will not consider an issue on appeal that was not passed upon by the trial court."[77] Frost argues this principle did not provide a sufficient basis for declining to review the cross-appeal because the issues of causation and spoliation were raised in the summary judgment motion and argued in the related briefing before the trial court. The court simply failed to reach the issues because it chose a different dispositional path. And Frost points out that because summary judgment rulings are reviewed de novo,[78] an appellate court may affirm an order granting summary judgment on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon.[79]

---

[77] *Ronnfeldt Farms, supra* note 1, 32 Neb. App. at 511, 1 N.W.3d. at 557.

[78] See e.g., *Thiele v. Select Med. Corp*., 316 Neb. 338, 4 N.W.3d 858 (2024).

[79] E.g., *Schuemann, supra* note 28.

[22] Although the principle is well settled that an appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court,[80] we agree with Frost that under the circumstances presented here, where the issues were presented to the district court on summary judgment, this principle did not prevent the Court of Appeals from reviewing an alternative ground for granting summary judgment that was presented to the trial court but not passed upon.

[23] Other principles may arguably have supported the Court of Appeals' decision not to address the cross-appeal,[81] but our disposition on further review makes it unnecessary to analyze whether the Court of Appeals erred by declining to review Frost's cross-appeal before remanding the cause for further proceedings.[82] An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[83] Because our de novo review persuades us the grant of summary judgment should be affirmed, it is not necessary to resolve Frost's last assignment of error on further review.

## V. CONCLUSION

Although our reasoning on further review differs from that applied in the courts below, we agree with the district court that Frost was entitled to summary judgment as a matter of law on the negligence claims alleged in the complaint. To

---

[80] E.g., *de Vries v. L & L Custom Builders*, 310 Neb. 543, 968 N.W.2d 64 (2021).

[81] See, e.g., *Saint James Apt. Partners, supra* note 51 (appellate court has discretion to decline to review all possible reasons supporting result if it concludes remand would be better means of resolving issue); *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 512, 519 N.W.2d 530, 543 (1994) (appellate court can decline to address assignments of error "either because [its] holding obviates the need to address the issues raised or because they are entirely without merit").

[82] See *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024).

[83] *Id.*

the extent the Court of Appeals' decision can be read to have concluded otherwise, it is reversed. We otherwise affirm the Court of Appeals' decision and remand the cause with directions to affirm the grant of summary judgment.

Affirmed in part, and in part reversed
and remanded with directions.

Miller-Lerman, J., participating on briefs.
Heavican, C.J., not participating.