IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MARTINEZ V. BLACKSTONE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MARYLOU MARTINEZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF PEDRO MARTINEZ, APPELLANT,

V.

DARRELL BLACKSTONE, APPELLEE.

Filed February 18, 2025.    No. A-24-290.

Appeal from the District Court for Scotts Bluff County: ANDREA D. MILLER, Judge. Affirmed.

Jerald L. Ostdiek, of Douglas, Kelly, Ostdiek, Snyder, Ossian and Vogl, P.C., for appellant.

Andrew W. Snyder, of Holyoke, Snyder, Longoria, Reichert & Rice, P.C., L.L.O., for appellee.

MOORE, PIRTLE, and WELCH, Judges.

PIRTLE, Judge.

INTRODUCTION

Pedro Martinez and Marylou Martinez were driving in Scotts Bluff County when they hit a cow that had wandered onto the highway. Prior to the collision, Darrell Blackstone had been hired to care for the cow and had erected an electric fence around the field where the cow resided. Pedro and Marylou filed a complaint in the district court for Scotts Bluff County against Blackstone alleging he was negligent in a variety of ways for the way he fenced in the property. While the lawsuit was pending, but unrelated to the accident, Pedro died. The district court eventually granted Blackstone's motion for summary judgment and dismissed the case with prejudice. Marylou now appeals that decision on her own behalf and on behalf of Pedro's estate. For the reasons that follow, we affirm.

- 1 -

BACKGROUND

In December 2017, Pedro and Marylou were driving in Scotts Bluff County when they hit a cow that was standing in the road. Previously on November 30, that cow and 121 others were moved to a nearby field for grazing. The cow that was hit belonged to Travis Krien who had hired Blackstone to feed, water, and care for the animal.

About a week prior to the cows being moved to the field, Blackstone's employees, Kim Erickson and Lyle Bell, erected a single strand barbed wire electric fence around the 160-acre property. The fence was built using a combination of T-posts and pencil posts. A T-post is a steel post in the shape of a T with notches on the side to hold wiring at a specific level. T-posts are typically used as corner posts in electric fences. A pencil post is smaller and is used to hold electric wire in between the T-posts. Erickson estimated that they used around 11 T-posts to frame the corners of the electric fence and then placed pencil posts every 20 steps. But for the portions that bordered the road, they placed pencil posts every 12 or 15 steps so the fence would be more secure. Along the entirety of the fence, the single strand of electric wire hung around 32 to 36 inches off the ground.

Part of the fence crossed a stream on the property which required special attention. Because the stream was below the grade of the field, T-posts were placed at field level on both sides of the stream and at stream level on both sides. Additionally, pencil posts were placed between the T-posts and one was placed in the middle of the streambed. Like the rest of the fence, the wire was positioned to hang around 32 to 36 inches above the streambed.

Nevertheless, on December 17, 2017, a cow escaped the enclosure, wandered on the road, and was hit by Pedro and Marylou. We will note that the record is not consistent regarding the date of the accident. While the court's order and Blackstone's annotated statement of undisputed facts list December 17 as the date of the accident, multiple testimonies and the complaint indicate the accident occurred on December 1.

On September 17, 2020, Pedro and Marylou filed a complaint alleging that Blackstone was negligent because he did not properly maintain his fence, failed to secure his enclosure, and used an inadequate fencing system. However, Pedro died on December 14, 2020, and left Marylou as his sole heir. On November 22, 2021, Marylou was appointed as the personal representative of Pedro's estate. On December 13, Marylou filed a motion for revivor and requested that the action be revived for her individually and in her capacity as the personal representative of Pedro's estate. On February 21, 2022, the court granted the motion for revivor.

On November 6, 2023, Blackstone filed a motion for summary judgment. A hearing was held on December 18. At the hearing, Blackstone offered seven exhibits that included copies of the complaint and answer, Erickson's affidavit, Erickson's deposition, Blackstone's deposition, Bob Burford's affidavit, and Ivan Rush's deposition. These exhibits were received. Marylou then reoffered copies of the complaint and Rush's deposition and offered Rush's affidavit. These exhibits were also received.

In his deposition and affidavit, Erickson stated that he and Bell built the fence around a week before the cows were put into the field. He stated that he had worked for Blackstone on-and-off for around 7 years and had built around 40 electric fences in his career. He explained that although he did not recall this occasion specifically because it had been many years, it was

their standard practice to inspect the fence before new cows were put in a field. He stated that someone would have driven the length of the fence in a four-wheeler to look for weak spots and that he would have tested the fence to make sure electricity was running through it. He also stated that they routinely had someone inspect the fence the morning after new cows were placed in a field and would have checked the fences each morning and evening afterward. He later clarified that while they checked to see if the fences were up twice a day, they only tested to see if electricity was running through them every 3 or 4 days.

Erickson testified that after the cows were placed in the field on November 30, 2017, he stayed with them until dusk and then checked the fence the following morning and evening. He said on both occasions the fence was up, had electricity running through it, and did not need any repairs. More specifically, he stated that at all points across the field and in the area around the stream, the electric wire was positioned between 32 and 36 inches above the ground or streambed. Erickson also testified that he checked the fence the day after the collision and did not notice any problems. More so, he said the cow involved in the accident was the only one that got past the fence throughout the time those cows were in the field.

Blackstone testified that in December 2017 he was managing around 1,600 cows on approximately six or eight fields. For the field in question, he stated that the fence was built around a week before the cows were dropped off on November 30, 2017. And although he did not build the fence, he outlined the procedure his employees followed in erecting and maintaining them. He explained that they checked the fences every day to make sure there was electricity running through them and were able to inspect the fences along the roadway when driving by. For these portions, he said that he, his family, and his employees routinely drove by the field on either side and would have noticed if the fence was down. However, the portions of the fence that did not border the road were inspected less frequently. Blackstone stated that those portions were only inspected every couple of days. He concluded by stating that it was rare for cows to get out of their enclosures and estimated that only one cow got out every year.

Burford was an expert hired by Blackstone. In his affidavit, he stated that he had been involved in the cattle business since 2002 and regularly fenced 500 to 800 acres with electric wiring. He outlined how Erickson and Bell erected the fence around the field and concluded that their post spacing and wire height were consistent with industry standards and typical of "almost any hotwire fence used in [the] area to contain cattle." As it related to the fencing around the stream, Burford stated that the fencing was not only sufficient to contain cattle, but went beyond what many ranchers would have done in a similar situation. He generally concluded that Blackstone and his employees constructed and maintained the fence in a reasonable manner that was consistent with the commonly accepted practices of the area. Further, he opined that it was not reasonably foreseeable for a cow to get out of the enclosure and wander onto the highway.

Rush was an expert hired by Marylou. He has worked as a beef specialist for the University of Nebraska for 35 years, has managed his own cow herd for 32 years, and has personally erected electric wire fencing. He generally testified that the fencing around the field was adequate and complied with normal industry standards. More so, Rush agreed that the placements of the T-posts and pencil posts along the stream were appropriate and went beyond what many ranchers would do in a similar situation.

However, when asked whether the fencing was adequate to contain the cattle, Rush expressed some reservations about the height of the wire as it crossed the stream. While he did not know if there was a depression due to the stream, he stated that in the event there was one, the wire might have needed to hang lower to keep the cows from going underneath it. He articulated that this was his only concern and that the wire needed to be around 32 to 36 inches above the streambed to adequately contain the cows. He continued to state that he did not know where the wire was positioned or how deep the water was in December 2017 and that it was entirely possible the wire was correctly placed at 32 to 36 inches above the streambed.

Rush then discussed how even an adequate fence was not 100 percent effective and that there were circumstances that might lead to cows getting out even if the fence was built correctly. These circumstances include cows learning to jump the fence, wild animals knocking the posts over, cows crawling under the fence, or cows getting spooked. However, he noted there was no evidence that any of this occurred and that the evidence showed the fence was still up and had electricity running through it after the accident. Rush concluded by not only opining that the fence was adequate to contain the cows, but that Blackstone was maintaining it properly, inspecting it at sufficiently regular intervals, and was abiding by the commonly accepted practices for electric fencing.

On March 22, 2024, the district court issued its order granting Blackstone's motion for summary judgment. This order noted that the complaint alleged that Blackstone was negligent for (1) failing to use ordinary care in maintaining the fence; (2) failing to use ordinary care in securing his enclosure so that the cow could not escape; and (3) failing to use a fencing system that adequately prevented the cow from escaping. The order first granted summary judgment on the first theory because Marylou had conceded the issue. For the second theory, the court limited the dispute to the fencing around the stream. The court found that the evidence indicated the fencing was 32 to 36 inches above the streambed and that this was appropriate, adequate, and consistent with industry standards. For the final theory, the court stated the evidence demonstrated that Blackstone used a single strand electric fence and that both Burford and Rush agreed this was adequate fencing to contain cattle. For these reasons, the court found that there were no genuine issues of material fact, granted Blackstone's motion for summary judgment, and dismissed the complaint with prejudice.

## ASSIGNMENTS OF ERROR

Restated and consolidated, Marylou assigns the court erred in granting Blackstone's motion for summary judgment.

## STANDARD OF REVIEW

An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Continental Resources v. Fair*, 317 Neb. 391, 10 N.W.3d 510 (2024).

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the

ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

## ANALYSIS

Marylou generally argues that summary judgment should not have been granted because there was a reasonable inference that Blackstone failed to properly position the electric wire 32 to 36 inches above the stream. She asserts that because the cow likely escaped from the stream area, a reasonable inference can be drawn that the wire was not correctly positioned. In this argument, she relies upon Rush's testimony that if there was a depression due to the stream, the wire should have been positioned to droop lower to maintain a height of 32 to 36 inches above the streambed.

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024). The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. *Id.* If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id.*

In order to succeed in an action based on negligence, a plaintiff must establish the defendant's duty not to injure the plaintiff, a breach of that duty, proximate causation, and damages. *Hand v. Starr*, 250 Neb. 377, 550 N.W.2d 646 (1996). The owner of domestic animals has the duty to exercise ordinary care to confine his or her livestock to prevent them from being unattended upon the public highway. *Id.* The principal test is whether one should reasonably have foreseen that any of the livestock would be upon the highway and the occurrence of such an accident; if the owner knows or, in the exercise of ordinary diligence, should know that any of the livestock are unattended upon the highway, it is the owner's duty to exercise ordinary care to round them up and confine them. *Id.*

Because Marylou's assignment only argues that the fencing around the stream was inadequate, we limit our review to whether there was a genuine issue of material fact regarding the fencing around the stream. In this review, we determine the district court did not err in granting Blackstone's motion for summary judgment.

It was uncontroverted that the fencing around the stream involved T-posts placed at field level on both sides of the stream and at stream level on both sides of the stream. In addition to these posts, the fence also included several pencil posts in between the T-posts and one pencil post in the streambed. Both experts opined that this fencing was adequate, consistent with industry standards, and beyond what a typical rancher would do in a similar situation.

Despite this agreement by both experts, Marylou essentially claims that the fact the cow escaped raises an inference that the fencing along the stream was positioned incorrectly. In this assertion, she relies upon the following testimony by Rush:

Q. Mr. Rush, in your experience are stream banks a common problem area as far as when cattle escape from a fenced area?

A. Yes, that would be the first place I would probably look.

Q. Why?

A. Well, one is the irregularity of the stream bank as I stated before. And then as the wire itself crosses the stream that's – that is another area that would – I would always look at and be concerned about.

Q. What is looping when it comes to fencing such as occurred in this – this case?

A. Well, I refer to it, of letting the wire drop down, loop down in a depressed area. It is easier to stretch the fence from the length of the space. But in the event that there's a low spot to allow the cows to pass under, then it sometimes is appropriate to loop another strand of wire there or to somehow lower that wire which would require more posts on each side and the middle.

Q. And is looping especially important when it comes to areas where you are dealing with changes in terrain, like streams?

A. Yes.

Q. Why is that?

A. Well, you're just making every effort to get the wire about – approximately 32 inches away from the level – up from the level where the cow would be walking or cattle would be walking.

Q. And in the case you observed the stream bed, how deep was the stream bed, do you know? I guess you estimated it before.

A. I didn't measure it but I would guess to the bottom of the stream bed to the edge of the stream would be in – 2 feet or maybe a little in excess, maybe – I don't know, 3 feet and I don't know exactly where the wire crossed that stream either.

. . . .

Q. In your opinion should they have looped the fence by the stream area?

. . . .

A. In the event that the wire was considerably above the bottom of the stream bed above 34 inches, 32, 36 inches then, yes, it would have been appropriate to loop a wire in that area.

However, later in his testimony the following colloquy occurred:

Q. . . . So as I understand your testimony today, you don't know what the height of the wire was between the T post to the pencil post in the stream to the other T post, correct?

A. That's correct.

Q. And it's possible that the wire was perfectly adequate in that 32, 34, to 36 inch height?

A. That's correct. Yes.

Q. So when you're talking about looping, you're only assuming that looping would be necessary to get a wire lower, correct?

A. That's correct.

Q. But with the facts that you have right now, you don't know if that was necessary?

A. That's correct.

Nothing in this testimony raises a genuine issue of material fact concerning the adequacy of the fencing around the stream. This testimony only indicates that if there was a depression that required looping of the wire, that Blackstone should have looped it, so it remained at 32 to 36 inches above the streambed. But as Rush explained, he was unsure if there was a depression, did not know how deep the water was, and did not know the height of the wire in December 2017. And as he clarified, it was entirely possible that the wire was positioned correctly.

We determine that Blackstone satisfied his prima facie burden by citing to materials in the record that demonstrate Marylou's evidence was insufficient to establish an essential element of the negligence claim. The evidence provided by Erickson, Blackstone, and both experts demonstrate that the fencing around the stream was adequate to confine the cows and that the wire was correctly positioned between 32 and 36 inches above the streambed. Because of this, the evidence demonstrates that it was not reasonably foreseeable a cow would escape the enclosure and wander onto the highway.

Upon the burden shift, Marylou failed to adduce any evidence, beyond mere speculation, that refuted the adequacy of the fencing along the stream. And although she generally argues that the cow's escape infers an inadequacy in the fence, that is not enough to satisfy her burden. As Rush stated, even adequate fencing does not guarantee that cows will not be able to escape an enclosure. With this, we determine Marylou failed to demonstrate that a genuine issue of material fact existed that precluded summary judgment. Therefore, we determine the district court did not err in granting Blackstone's motion for summary judgment.

## CONCLUSION

We conclude that Marylou failed to produce evidence that raised a genuine issue of material fact as to whether Blackstone breached the duty of care he owed to her and Pedro. Accordingly, the district court did not err in granting Blackstone's motion for summary judgment.

AFFIRMED.